[No. C047923. Third Dist. Oct. 26, 2005.]

ROBIN J. SAVILLE, Plaintiff and Appellant, v.
SIERRA COLLEGE et al., Defendants and Respondents.

COUNSEL

Clayeo C. Arnold, Anthony M. Ontiveros and Leslie Mitchell for Plaintiff and Appellant.

Johnson Schachter & Lewis, Luther R. Lewis and Danielle R. Teeters for Defendants and Respondents.

OPINION

**NICHOLSON, J.**—Plaintiff suffered injury while practicing arrest and control techniques during a peace officer training class. He sued the community college that offered the class for negligence. The trial court granted the college's motion for summary judgment, determining the complaint was barred by the doctrine of primary assumption of risk. For the reasons that follow, we affirm.

## UNDISPUTED FACTS

In 2000, plaintiff enrolled in helicopter flight school in Sacramento to become a helicopter search and rescue pilot. After four months of training, plaintiff left the school due to financial concerns. He planned to complete the remaining hours required for his training through on-the-job experience as a search and rescue helicopter pilot.

To improve his chances of being hired, plaintiff enrolled in a class at defendant Sierra College entitled Administration of Justice 600, also referred to as PC 832 (referring to Pen. Code, § 832), Arrest, Communications, and Firearms. Sierra College is a community college operated by the Sierra Joint Community College District. (For convenience, we refer to the different Sierra College entities named in plaintiff's complaint as the College.)

The course was open to any student who could pass a firearms background check. The College's catalog for spring 2001 described the course as follows: "P.C. 832: ARREST, COMMUNICATION, AND FIREARMS [¶] . . . [¶] Meets requirements of California Penal Code Section 832 requiring individuals having Peace Officer powers to complete a training course prescribed by the Commission on Peace Officer Standards and Training (POST). Partially satisfies POST Level III Module training. Covers ethics, courts, community relations, laws of arrest, use of force, search and seizure, investigations, arrest and control methods, shooting principles, and range qualification." The class was scheduled for about four hours every Tuesday and Thursday evening from January 16 through February 24. The class would also meet all day on three Saturdays. Plaintiff believed having the POST certificate would "help get [his] foot in the door."

The course consisted of three portions: lectures, methods of arrest and control, and a firearms portion. Plaintiff declared in his separate statement of undisputed facts that participation in the activity to learn arrest and control methods was required: "The class was pass/fail. In order to pass the class, the students were required to attend and pass all three parts including arrest and control procedures."

Auburn Chief of Police Nick Willick was the lead instructor of the course. He taught the lecture portion of the course, and other officers taught the control methods and firearms portions. Willick explained the arrest techniques portion of the course to the students. Although he did not use the word "role-playing," Willick informed the students they would learn the techniques in as realistic an experience as possible, and they would be "modeling" the actions an actual police officer would take when performing a takedown in the field.

At one of the lecture sessions held before the control methods activity, Lieutenant David Johnstone of the Rocklin Police Department gave a lecture on the arrest and control techniques the students would subsequently learn. In the lecture, he told the students they would be playing the roles of police officer and suspect in order to learn the techniques. When asked if a student could pass the class if the student could not meet the physical requirements of the techniques portion, Johnstone testified the student would not complete that portion of the class. If, however, a student was able to play the role of police officer but not suspect, that student could still pass the class.

Officer Scott Horrillo was one of the instructors at the activity where the techniques and maneuvers were taught and practiced. Horrillo also testified the students were required to attend the activity. They could not pass the course unless they passed that activity.

Saturday, February 3, 2001, was the first day the students performed techniques and maneuvers for controlling a suspect. The class was held at a private kickboxing gym. Mats covered the entire floor area. Scheduled to last most of the day, the class began at 8:00 a.m. with a 45-minute period for stretching exercises and calisthenics.

Three police officers, Officers Horrillo, Susan Davis, and Casey Finney, taught the class that day. Finney first demonstrated a step-back maneuver, showing the students how to get away from a suspect. He next demonstrated a hand-hold maneuver on a student a couple of times. After the demonstration, the students paired up and practiced the move on each other. Plaintiff, weighing 230 pounds and standing six feet one inch tall, paired up with Terry Giese, who weighed 190 pounds and stood five feet 10 inches tall.

After the hand-hold move, the class went on to learn four different takedown moves. Two of those moves were performed facing the suspect, and the other two were performed from behind the suspect. The first takedown move required the "arresting officer" to jab his fingers down inside the suspect's collarbone with enough pressure to force the suspect down to

his knees. Finney demonstrated the move, and then plaintiff and Giese practiced the move on each other. They performed the maneuvers at essentially half speed.

The second takedown maneuver required the arresting officer to grab the suspect by the shoulders and trip him over the officer's leg. Finney demonstrated this move, and plaintiff and Giese practiced the move. Both were able to knock each other over and onto the ground.

The third maneuver involved the arresting officer grabbing the suspect's hair from behind and pulling the suspect backward and down to the ground. Finney demonstrated this move on a student, and plaintiff and Giese successfully knocked each other down to the mat by using this move.

The fourth takedown maneuver was described as a forehead sweep. According to plaintiff and Lt. Johnstone, the arresting officer performing this move would come from behind the suspect, wrap his right hand around the suspect's face and grab the bridge of the nose, put his right elbow in the suspect's back, and then pull the head back to compress the neck into the spine, causing the suspect to fall to the ground. The officer was to stand to the left of the subject at a 90-degree angle.

Finney demonstrated this maneuver, and then plaintiff and Giese performed the move on each other two or three times before breaking for lunch at 11:00 a.m. Each person knocked the other down, and neither was injured. While the students practiced the moves, the three officers walked around the room and observed the students to see if they were performing them correctly. At least one officer saw plaintiff perform each maneuver at least one time.

Between noon and 12:15 p.m., plaintiff and Giese practiced the maneuvers they had learned that morning. Plaintiff was injured while the two performed the forehead sweep with Giese acting as the arresting officer and plaintiff as the suspect. As Giese pulled plaintiff down, plaintiff hit his neck on Giese's knee. Plaintiff sustained a herniated cervical disc and other injuries that necessitated surgery.

At no time during the class did the students receive verbal or written instruction on where to place their feet while performing the maneuvers. However, Officer Finney, when demonstrating the forehead sweep, would step aside as he pulled the suspect back. This was the way he performed the maneuver that day. After learning how Giese performed the forehead sweep maneuver on plaintiff, Officer Davis and Lt. Johnstone opined Giese had performed the maneuver incorrectly. His feet were not correctly positioned when the injury occurred.

Plaintiff understood the class was a police officer training course. (He later changed his testimony to say it was an administration of justice class.) The College's catalog indicated the class would cover the use of force and arrest and control methods. He understood the training had to replicate real-life situations, and he acknowledged the curriculum called for demonstrations. He understood the class was designed to train him how to perform were he to become a police officer. He understood the class's philosophy increased the risk of injury to a point.

When asked if he understood when he enrolled the class would include physical activity, plaintiff did not say no unequivocally. Instead, he responded, "I did not know that I would be used, so to speak, as a guinea pig by an inexperienced person to do these moves or have these moves done on me with a prior injury to my neck from when I was taking care of my mother. I wouldn't have really agreed to have done these if I knew that an inexperienced person would be doing these on me."

As the class progressed that morning, plaintiff knew the class involved him getting grabbed and getting knocked down. He became concerned about a preexisting neck injury, and wondered if it was safe for him to continue participating in the class. Before he was injured, plaintiff considered informing the instructors of his prior injury, but he did not. He had no particular reason for not telling them.

Plaintiff filed this action against the College seeking damages for his injuries. He alleged the College negligently failed to: (1) inform plaintiff when he registered for the class of the risk of injury from participating in the takedown maneuvers; (2) evaluate or screen plaintiff, or advise him to do the same, in light of the class's physical requirements and risk of injury; and (3) supervise and properly train plaintiff and his classmates to perform the takedown maneuvers correctly.

The College filed a motion for summary judgment, arguing plaintiff's claims were barred by the doctrine of primary assumption of the risk and the College owed no legal duty to prevent the harm he suffered.

The trial court granted the motion, ruling the doctrine of primary assumption of the risk applied to the facts of this case. The court reasoned: "Plaintiff's papers and evidence show at most that the instructors of the course may have been negligent. This is not enough as a matter of law. Plaintiff must show that material issues of fact exist as to whether defendants intentionally injured the plaintiff, or engaged in conduct that is so reckless as to be totally outside of the range of the ordinary activity involved in teaching or coaching. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th

990, 1018 [4 Cal.Rptr.3d 103, 75 P.3d 30].) Plaintiff's facts submitted do not meet this burden." The court entered judgment against plaintiff.

Plaintiff appeals, claiming the doctrine of primary assumption of the risk does not apply (1) to the activities in which plaintiff was engaged when he was injured; and it does not apply because (2) the instructors increased the risks inherent in the maneuvers being taught; and (3) the College had a duty of care not to negligently structure the class.

## DISCUSSION

### I

### *Standard of Review*

■ A trial court will grant summary judgment where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A defendant moving for summary judgment must prove the action has no merit. He does this by showing one or more elements of plaintiff's cause of action cannot be established or that he has a complete defense to the cause of action. At this point, plaintiff then bears the burden of showing a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subds. (c), (o)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

■ On appeal, we exercise our independent judgment, deciding whether undisputed facts negate plaintiff's claims as presented in his complaint or state a complete defense. (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 37 [105 Cal.Rptr.2d 525].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850, fn. omitted.)

### II

### *Primary Assumption of the Risk*

■ "As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. (See Civ. Code, § 1714.)" (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315 [11 Cal.Rptr.2d 2, 834 P.2d 696] (hereafter *Knight*).) The doctrine of primary assumption of the risk is an exception to the general rule. The doctrine arises "where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the

plaintiff from the particular risk of harm that caused the injury . . . ." (*Knight, supra,* 3 Cal.4th at pp. 314–315.)

■ Primary assumption of the risk is an objective test. It does not depend on a particular plaintiff's subjective knowledge or appreciation of the potential for risk. (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1573 [2 Cal.Rptr.3d 883]; *Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 116 [96 Cal.Rptr.2d 394].)

■ Determining the existence and scope of a defendant's duty of care "is one of law to be decided by the court, not by a jury, and therefore it generally is 'amenable to resolution by summary judgment.' (*Knight, supra,* 3 Cal.4th at p. 313.)" (*Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at p. 1004.)

■ Whether a duty exists "does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on [1] the nature of the activity or sport in which the defendant is engaged and [2] the relationship of the defendant and the plaintiff to that activity or sport." (*Knight, supra,* 3 Cal.4th at p. 309.)

■ If a duty is found not to exist, primary assumption of risk applies, and a defendant is liable only if he intentionally injures the plaintiff or engages in conduct so reckless as to be totally outside the range of the ordinary activity involved in the sport or activity. (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 480–481 [63 Cal.Rptr.2d 291, 936 P.2d 70]; *Knight, supra,* 3 Cal.4th at p. 320.)

The trial court determined plaintiff's claim for relief was barred by the doctrine of primary assumption of risk. Plaintiff argues the trial court erred for numerous reasons. We will address each as they relate to the doctrine's two required elements.

A. *Nature of activity*

■ Courts have provided some guidance, particularly in the sports context, on how we review the nature of the activity to determine if primary assumption of the risk excuses the normally applicable duty of care. In general, the doctrine applies to activities or sports where "*conditions* or *conduct* that otherwise might be viewed as dangerous often are an integral part of the sport itself." (*Knight, supra,* 3 Cal.4th at p. 315, italics added.)

The *Knight* court used skiing as an example of a sport that involved inherently dangerous conditions. "[A]lthough moguls on a ski run pose a risk

of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them." (*Knight, supra*, 3 Cal.4th at p. 315.)

*Knight* held that careless conduct by others involved in the activity could also be an inherent risk of that activity. "For example, numerous cases recognized that in a game of baseball, a player generally cannot recover if he or she is hit and injured by a carelessly thrown ball [citation], and that in a game of basketball, recovery is not permitted for an injury caused by a carelessly extended elbow [citation]." (*Knight, supra*, 3 Cal.4th at p. 316.)

■ In these types of activities, the integral conditions of the sport or the inherent risks of careless conduct by others render the possibility of injury obvious, and negate the duty of care usually owed by the defendant for those particular risks of harm. (*Lilley v. Elk Grove Unified School Dist.* (1998) 68 Cal.App.4th 939, 943 [80 Cal.Rptr.2d 638].) A duty imposed in those situations would significantly change the very purpose or nature of the activity. "The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature." (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 253 [38 Cal.Rptr.2d 65]; see *Knight, supra*, 3 Cal.4th at pp. 318–319.)

■ The takedown maneuvers here bear similar risks of injury inherent in many sports. The maneuvers are inherently dangerous. One person is intentionally throwing another to the ground. "Whenever gravity is at play with the human body, the risk of injury is inherent." (*Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112, 1114 [75 Cal.Rptr.2d 801].)

Careless conduct by others is also an inherent risk in performing the maneuvers. Plaintiff acknowledged both he and his partner were inexperienced and had not learned or practiced these maneuvers before the class. Even with the steps taken by the officers to minimize the risk of injury—personal training, placing mats on the floors, demonstrating the moves, observing the students perform the moves—the risk of harm from participating in the actual maneuvers with an inexperienced person remained obvious, and plaintiff suffered injury from that particular risk. Grabbing someone's face from behind, pushing his head into his spine, and throwing him back and down to the ground with an elbow in his back, even at half speed, could hurt someone.

Imposing a duty to eliminate the risk of injury from the activity in this particular classroom situation would invariably chill vigorous participation in learning the maneuvers. Indeed, it would defeat the very purpose of the class.

Under questioning from the panel at oral argument, the College's attorney stated the takedown activity was a required component of the class prescribed by POST. The class, referred to by POST as PC 832, Arrest and Firearms, is a legislatively mandated course all persons desiring to become peace officers must take. (Pen. Code, § 832; Cal. Code Regs., tit. 11, §1005, 1081.) POST prescribes the class's curriculum, which includes learning how to take physical control of a subject in an arrest or detention situation. (Training & Testing Specifications for Peace Officer Basic Courses, incorporated by reference at Cal. Code Regs., tit. 11, §§ 1005, 1007, 1008.) Each student must pass an Arrest Methods Skills Test, a POST-developed test that requires the student to demonstrate the mechanics of control holds and take-downs. (POST Administrative Manual, § D-1-7, subds. (a)(5)(C), (d)(2)(B) <http://www.post.ca.gov/regulations/doc/section_d.doc#D17> [as of Oct 26, 2005], incorporated by reference at Cal. Code Regs., tit. 11, § 1005.) A student who fails the test will be required to retake the course's arrest component. (POST Administrative Manual, § D-1-7, subd. (d)(2)(C) <http://www.post.ca.gov/regulations/doc/section_d.doc#D17> [as of Oct. 26, 2005], incorporated by reference at Cal. Code Regs., tit. 11, § 1005.)

■ The maneuvers cannot successfully be learned for passing the POST examination and for eventual use by peace officers without incurring the risk of injury from practicing them. Eliminating the risk of injury inherent in the maneuvers would require eliminating the maneuvers from the class. Such a result is exactly what the doctrine of primary assumption of risk is designed to prevent. For these reasons, the nature of the activity indicates the presumption of risk doctrine applies here.

Plaintiff disagrees with this conclusion on numerous grounds. First, plaintiff asserts the activity at issue is just a community college class. The College allegedly gave no indication the class involved any potentially dangerous activity, and the activity was not an integral part of the class.

This argument misses the mark. At issue is not whether signing up for the class was an inherently dangerous activity; the issue is whether the takedown activity participated in by plaintiff as part of the class was an inherently dangerous activity. (See, e.g., *Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 209–210 [105 Cal.Rptr.2d 600] [recovery barred for death that occurred during training class for volunteer ski patrol].) We have already shown the activity was an integral part of the class.

Second, plaintiff argues the doctrine cannot apply here because he did not voluntarily choose to participate in the takedown activity. The evidence is otherwise. He voluntarily registered for the class with the initial understanding from the College's catalog the class was a training class for peace officers

that satisfied the requirements imposed by POST. The class would cover "laws of arrest, use of force, search and seizure, investigations, arrest and control methods, shooting principles, and range qualifications." As the class commenced, he understood there would be a component dedicated to control techniques. He was told he would model the actions of a police officer and would play the roles of arresting officer and suspect. At the class where the injury occurred, he recognized the activities involved being thrown to the ground by another person with little experience. On each of these occasions, plaintiff did not withdraw from participating.

Plaintiff argues he was forced to participate in the maneuvers or else risk failing the class. Even if that is so, the risk of failing the class does not demonstrate plaintiff was coerced to participate in the activity against his will.

Plaintiff is an adult who voluntarily participated in the training class. No one required him to enroll. He could have expressed his concerns at any time. He admits it was not necessary to play the role of suspect. He could have easily and responsibly discovered that it was not necessary to play the role of suspect. There is no disputed fact that plaintiff chose to participate in the takedown activity.

Third, plaintiff claims the takedown maneuvers were not the type of "activity or sport" to which the primary assumption of risk doctrine applies. Specifically, plaintiff asserts the doctrine applies only to active sports and employment. He argues the maneuvers in which he engaged were not sports or part of his employment, although plaintiff viewed the class as an aid to his employment goals. We agree the maneuvers were not sport or required as part of plaintiff's employment, but that does not end our analysis.

In 1993, this court stated the doctrine applied only to sports activities. (*Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322, 329–330 [21 Cal.Rptr.2d 178].) Since then, however, courts have extended the doctrine's reach. The Supreme Court, for example, declared the "firefighter's rule," under which a person who negligently started a fire is not liable for injuries suffered by a firefighter battling the fire, was a proper application of the primary assumption of risk doctrine. (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 539 [34 Cal.Rptr.2d 630, 882 P.2d 347].) This rule of assumption of risk has nothing to do with sports.

Other courts have applied the doctrine to training performed to learn or practice a sport (*Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 529–532 [50 Cal.Rptr.2d 671] [judo instructor owed no duty of care to student injured in class]), risk-inherent activities

within the scope of the plaintiff's employment (*Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761, 1764–1765 [53 Cal.Rptr.2d 713] [nurse's aide in convalescent hospital hired to protect mentally incompetent patients from injuring themselves and others barred from recovering for injuries suffered when patient attacked her]), training activities required for the plaintiff's employment (*Hamilton v. Martinelli & Associates* (2003) 110 Cal.App.4th 1012, 1020–1026 [2 Cal.Rptr.3d 168] [probation officer injured while learning restraining methods in a training class barred from recovering]), training for a noncompetitive activity (*Aaris v. Las Virgenes Unified School Dist., supra,* 64 Cal.App.4th at pp. 1117–1118 [student cheerleader injured while practicing cheerleading routine barred from recovering against school district], and to instances where persons sought to be trained for volunteer positions with the National Ski Patrol System. (*Kane v. National Ski Patrol System, Inc., supra,* 88 Cal.App.4th at pp. 209–210.)

In short, "[t]he full scope of the defense of primary assumption of risk has yet to be established." (*Bushnell v. Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th at p. 530.) The *Knight* court stated the doctrine applied to *activities* or sports. Nowhere did it limit the scope of activities subject to the defense only to sports or employment-related activities. Instead, it established the defense's governing principles of risk for application on a case-by-case basis. Applying those principles here discloses the takedown activity practiced in the police training class was the type of activity to which the defense may apply. The activity bears the same risks of injury and negligent participation by others as those sports and employment activities where courts have applied primary assumption of risk. It, too, will lose its fundamental character should a duty of care be imposed to protect against its inherent risks. That the training maneuvers were not necessarily a sport or related to plaintiff's employment does not prevent the doctrine from applying.

Reaching this conclusion, however, does not end our discussion. We must also review the relationship of plaintiff and the College to the takedown maneuvers before we can determine whether the doctrine applies here.

## B. *Relationship of the parties to the activity*

Duties regarding the same risk may differ depending on the role played by the particular defendant. In the sporting context, for example, a defendant could be in the role of "coparticipant, passive observer, instructor, coach, owner of the venue in which the sport is played, or supplier of the equipment used in the sport." (*Peart v. Ferro* (2004) 119 Cal.App.4th 60, 72 [13 Cal.Rptr.3d 885].)

In his complaint, plaintiff challenged the College as both the instructor and the sponsor of the class where the activity occurred. He alleged the College negligently supervised and trained him in learning the maneuvers. He also alleged the College, as the sponsor, was negligent in failing to inform plaintiff of the risk of injury from the class's activities and failing to "physically evaluate or screen plaintiff or advise him to do same" in light of the physical abilities needed to perform the maneuvers.

 As to the College's role of instructor, the Supreme Court has made clear that primary assumption of risk applies to instructors and coaches of activities except where the instructor has increased the risk inherent in the learning process. (*Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at p. 482.) Specifically, where the plaintiff seeks to recover on the basis the instructor required the plaintiff to perform without providing adequate instruction, the plaintiff must prove "the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's conduct was 'totally outside the range of the ordinary activity' . . . involved in teaching or coaching the sport [or activity]." (*Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at p. 1011, citation omitted.)

For purposes of its summary judgment motion, the College does not dispute plaintiff's claims: (1) the instructors did not verbally teach Giese or him how to position their feet when performing the maneuvers, and (2) the teaching officer did not recall informing the students it was not necessary for them to play "suspect" if they had preexisting injuries, although it was the officer's practice to do so.

These facts, however, do not rise to the level of intentional or reckless harm. In light of all of the undisputed facts, the instructors' actions were not totally outside the range of the ordinary activity involved in teaching the maneuvers. The instructors taught the maneuvers and demonstrated them before allowing the students to practice them. The instructors accurately demonstrated the takedown maneuver, including the side-step taken by the arresting officer to position his feet correctly. The students saw how the maneuvers were to be performed correctly and also saw the risk of harm in doing so. The instructors observed the students as they practiced the maneuvers. Even if negligent, the instructors were not reckless and certainly did not engage in conduct so reckless as to be totally outside the range of ordinary teaching for the class. (*Lupash v. City of Seal Beach* (1999) 75 Cal.App.4th 1428, 1436 [89 Cal.Rptr.2d 920].)

Instruction takes many forms, and not all are verbal. Demonstration and practice are forms of instruction. This is especially so in a class for peace officers that involves forceful physical activity. Words alone do not suffice. Indeed, demonstration followed by emulation, attended, inevitably, by trial

and error, is fundamental to peace officer training and instruction. There is no fact suggesting the instruction here was recklessly wrong, or wrong at all.

Thus, due to the nature of the activity and the lack of evidence indicating the College acted recklessly in instructing the class, we conclude plaintiff's allegations against the College in its role as instructor are barred by primary assumption of risk.

■ We turn to discuss the College's role as sponsor or organizer of the class. The owner or organizer of an activity is under a duty not to increase the risk of injury inherent in the activity. It must minimize the risks, but need not do so at the expense of altering the nature of the activity. (*Knight, supra*, 3 Cal.4th at p. 317.)

For example, an organizer of a marathon has a duty to organize and conduct a reasonably safe race. That duty includes the obligation to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids along the course. Injuries arising from a breach of this duty are reviewed under the doctrine of secondary assumption of risk, and are thus determined under the principles of comparative fault. (*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 178–179 [119 Cal.Rptr.2d 497]; see also *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134–135 [40 Cal.Rptr.2d 249] [defendant owner of a golf course had obligation to design course that would minimize the risks that players would be hit by golf balls and provide protection for players from being hit in the area of the course where the greatest danger existed].)

Plaintiff's complaint pled facts accusing the College of negligence in its role as the class's sponsor. The College's motion for summary judgment did not attack those allegations. It argued only against plaintiff's allegations of the College's role as the class instructor. In his defense against the motion, however, plaintiff responded to the College's attack *without* arguing whether the College could also be liable in its role as the sponsor. He raises the argument for the first time before us.

Deciding under general principles of forfeiture and theory of the trial, we decline to consider the argument here. "Ordinarily the failure to preserve a point below constitutes a waiver of the point. [Citation.] This rule is rooted in the fundamental nature of our adversarial system: The parties must call the court's attention to issues they deem relevant. ' "In the hurry of the trial many things may be, and are, overlooked which could readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." ' [Citation.] . . .

"The same policy underlies the principles of 'theory of the trial.' 'A party is not permitted to change his position and adopt a new and different theory

on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party.' [Citation.] The principles of 'theory of the trial' apply to motions [citation], including summary judgment motions. [Citation.] . . . It would be manifestly unjust to the opposing parties, unfair to the trial court, and contrary to judicial economy to permit a change of theory on appeal." (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28–29 [21 Cal.Rptr.2d 104] [alternate basis of liability not raised by appellant in opposing summary judgment motion below will not be considered on appeal].)

Here, the College argued primary assumption of risk barred all recovery under plaintiff's complaint. The parties' arguments addressed only that theory, and the action was resolved exclusively on that theory. Plaintiff's duty was to direct the court's attention to any different factual basis of liability on which he could rely. Plaintiff failed to do this, and forfeiture is appropriate. Indeed, if this were permitted procedure, parties opposing and losing summary judgment motions could attempt to embed grounds for reversal on appeal into every case by their silence.

Plaintiff argues we can reach the issue because it is one of law presented on undisputed facts. However, there are insufficient facts on which we could find liability. Plaintiff argues the College was negligent because it did not warn potential students in the course catalog of the risk of injury involved with the class. As discussed above, the undisputed facts demonstrate plaintiff was on sufficient notice of the risk of injury from the catalog's class description, information provided by the instructors, and from observing and participating in the activity prior to being injured. The language of the course description does not establish by itself the College in sponsoring the class negligently failed to warn plaintiff of the risk of injury inherent in learning the takedown maneuvers.

Plaintiff complains the College was negligent in not considering whether the takedown maneuvers were a necessary component of the class. He cites to no facts supporting the assertion. Indeed, the College had no discretion to exclude the maneuvers. They were a required component of the class under POST regulations.

Finally, plaintiff argues the College was negligent for not ensuring the instructors were properly trained. Again, plaintiff cites to no facts supporting this assertion.

In short, plaintiff has given us insufficient facts by which we could determine either the College violated its duty as a matter of law or that material factual issues exist foreclosing us from reaching the issue. Under this record, forfeiture is the appropriate result.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the College. (Cal. Rules of Court, rule 27(a).)

Davis, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied November 28, 2005, and on October 31, 2005, and November 28, 2005, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 25, 2006, S139396. Chin, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.