Filed 4/29/14  Garcia v. Eastland Plaza CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| LUZ GARCIA et al., | C066667 |
| Plaintiffs and Appellants, | (Super. Ct. No. CV031243) |
| v. | |
| EASTLAND PLAZA et al., | |
| Defendants and Respondents. | |

Decedent Marco Garcia, manager of Ybarra's Jewelers, was found stabbed to death near an open safe in the back of the store after hours.  Plaintiffs (his widow and children) brought this wrongful death action against Eastland Plaza (Eastland), the shopping center in which the jewelry store is located; Delta Hawkeye Security (Delta), the shopping center's security firm; PAQ, Inc. (the corporate name of Food 4 Less), the shopping center's anchor tenant that had control over the lighting in the section of the mall parking lot outside its store and the adjacent jewelry store; and Hussman Corporation (Hussman), the firm that maintained the electrical and other systems for

1

Food 4 Less. During trial, plaintiffs settled with Delta for $200,000 (purportedly one-fourth of the overall demand in negotiations), and with Hussman for $100,000 (one-eighth of the demand). The jury thereafter returned verdicts for Eastland Plaza and Food 4 Less, finding that they were not negligent on a vote of nine to three.

On appeal from the September 2010 judgment, plaintiffs contend the trial court erred in refusing their special instructions on the doctrine of vicarious liability for a nondelegable duty, in limiting evidence of previous incidents of violence to *only* 12 of the 30 that their expert wanted to offer in support of his opinion, and in excluding evidence of decedent's purported habit of declining to reenter the jewelry store after locking up and activating the alarm. We shall affirm the judgment.

## FACTUAL BACKGROUND

Eastland is a large Stockton mall (containing 160,000 square feet of tenant space) not far from the intersection of California State Routes 4 and 99. As its counsel candidly noted in one hearing, "it's probably not the nicest part of Stockton." Its property manager oversaw security issues for the mall. The property manager had engaged the services of Delta to provide uniformed security guards, who would ride through the property in distinctive electric vehicles with strobe lights, as well as conduct bicycle patrols during the day and foot patrols on major holidays. Eastland's property manager was aware that "major crimes" had occurred in the parking lot. However, he directed Delta to focus on preventing property crimes in the rear of the stores to thwart a nearby homeless encampment from scavenging. Accordingly, Delta gave orders to its employees to this effect. Among other work orders was a directive to report to the property manager whenever lights in the parking lot did not come on.[1] There was also a

---

[1] The Eastland property manager also checked daily to see whether the lights in the parking lots were illuminated, both before dawn and then in the evening.

2

one-hour cycle of checkpoints throughout the parking lot (which did not include the fronts of Food 4 Less or the jewelers) to which the guards were expected to adhere. Food 4 Less had its own guards at the doors to watch for shoplifting and keep an eye on the sidewalk outside.

Food 4 Less operates 24 hours a day. It is a store with a large amount of foot traffic (300 to 400 people per hour) from early evening until later at night. As the only Eastland tenant with round-the-clock operations, it arranged with Eastland to assume control over the lighting in the parking lot in the vicinity of its store. It engaged the services of Hussman, its original electrical contractor, to install and operate a new computerized lighting system that included the lights in the parking lot outside its store. The controls were in a locked alcove to the rear of the Food 4 Less store. Only Hussman had the ability to operate the complex computer system. However, there was a manual override that could turn on the lights for 90 to 120 minutes. Lights in other sections of the parking lot operated independently of the Food 4 Less controls.

In September 2005, the Food 4 Less night manager arrived just after midnight and noticed the lights in the parking lot were off. Apparently, he did not take any action on his own to turn them on (being unaware of the manual override), but reported the light issue to his superior. When his superior arrived at the store at 6:00 a.m., the lights were on and remained on during the day. He did not call Hussman about the problem until late that afternoon, at which point Hussman could not send a technician until the next day. In the interim, the lights in the parking lot again failed to turn on that night.

As scheduled, the Hussman technician arrived the following afternoon. He told the store manager that the problem had been a "pinched wire." A former Hussman employee testified that a pinched wire would not have had anything to do with the problem with the timer's programming. The former employee also thought someone at

3

Food 4 Less must have operated the manual override, because this would change the timer's programming.

There was only one security guard on duty that evening of September 13, 2005. He was 21 years old, and had been working for Delta for about a month. He was deaf in one ear, hard of hearing in the other, and had an affect that could make one question his mental acuity. He would try to patrol the entire mall each hour. That night, he first patrolled the parking lot on a bicycle, then began patrolling in the rear of the stores. At some point, he noticed the lights in the parking lot by Food 4 Less had turned off. He notified both his supervisor and the Eastland property manager; the latter testified that he would have told the guard to focus his surveillance on the parking lot as a result of the lighting problem, but the guard did not recall him saying this. The guard later told a police investigator that he had patrolled in the rear of the stores from 8:00 to 8:50 p.m.

That night decedent was working with two other employees. They closed the jewelry store in the customary fashion, beginning the process at 7:30 p.m. to finish by 8:00 p.m. Once everything was locked into the safe, the other employees waited by the front door as decedent set the alarm. The records of the alarm company indicated that it was activated at 8:14 p.m. Decedent locked the front door, and the group commented that it looked unusually dark outside.[2] Their cars were all parked near each other in the spaces along the walkway outside the store. Decedent and one employee watched as the other walked to her car; decedent then walked with the other employee to her car before heading toward his own. The employees last saw him getting into his car and closing the door.

---

[2] Both the security guard and the jewelry store employees noted that it was not pitch black outside, because there were still some lights on; one employee believed she could discern the race of a person at over 60 feet under the lighting conditions, and the other did not have any difficulty observing decedent from 15 feet away.

4

According to the alarm company's records, the alarm was turned off five minutes after activation. One of the employees testified that she had never observed decedent return to the store after locking up.

When decedent did not arrive home at his customary time, his wife called her brother (the store's owner). The owner went to the mall, arriving shortly after 10:00 p.m. The owner saw decedent's car, still in its parking place. The lights in the parking lot were still off. Decedent's car was locked. The owner called the alarm company, and learned that the alarm had been turned off two hours earlier. While speaking with the alarm company, the owner noticed the front door of the store was unlocked. Opening the door, he could see that the door to the safe was open. The owner was afraid to enter the store. The police, whom the alarm company had summoned, arrived soon after. They turned on the parking lot lights.

When the police entered the store, they found decedent's body in the back; there were signs of a struggle. The officer who testified at trial said that when he checked the scene, he did not see any signs of a struggle at the store entrance (which was a focus of his attention) or in the path between decedent's car and the entrance. The officer examined decedent's car, which seemed undisturbed. When the officer checked the surveillance cameras in the jewelry store, he discovered that they had not been recording that evening. He did not recall seeing any blood on the door to the store that night, and thought it "highly unlikely" that everyone on the crime scene would have overlooked it if any had been present. However, when they returned a day later, there was blood outside the door and on the window evident to everyone, and a police investigator took pictures of it.[3] The officer did not have any way of determining whether decedent had returned to

---

[3] Another police investigator took a picture of the outside of one of the entry doors to the store on the night of the homicide because she thought there was blood on a portion of the outside surface, apparently by the handle. She did not recall whether she ever

the store on his own or under coercion. As of the trial, the police had not identified anyone responsible for the homicide.

As an exhibit graphically shows, decedent had numerous shallow stab wounds in the back of his neck; the pathologist also described over a dozen deeper stab wounds elsewhere on his body. The neck wounds (and some shallow back wounds) were consistent with some sort of coercion being applied to the victim, but the pathologist could only speculate whether this was to induce decedent to reenter the store, or to open the safe after he was already inside the store. Decedent was also beaten. There were three fatal stab wounds to his chest and the right side of his neck. He likely died within a matter of minutes, but could have survived as long as 30 minutes.

Plaintiffs presented a security expert. He related the circumstances underlying a dozen incidents of violent crime in the mall parking lot between January 2003 and May 2005—primarily armed robberies and assaults with deadly weapons—and asserted these would put a reasonable owner of property on notice of the need to take remedial action for the safety of patrons. As a result, it was his opinion that at the time of the homicide the absence of lighting in the parking lot (or a protocol for promptly restoring the lighting) or a visible security presence in the parking lot (as opposed to the focus on securing property in the rear of the mall) breached a standard of due care. The expert also offered his opinion about the circumstances of the homicide, asserting that assailants must have confronted decedent in some fashion at his car and forced him at knifepoint to return to the store (relying on the first police investigator's picture of purported blood on the store door's exterior). The stab wounds to the back of the neck were prototypical of 15 other robberies with which the expert was familiar. The absence of lighting or a

determined if it was in fact blood. This picture is not included in the record on appeal, which prevents us from comparing it with the later pictures.

6

visible security guard who might have seen the felons allowed this to occur. He also asserted that it was industry practice never to reenter a jewelry store after locking up.

## DISCUSSION

## I. The Special Instructions Were Not Proper

### A. *Procedural Background*

On the first day of trial, plaintiffs submitted a list of proposed jury instructions. Among the nine special instructions are what plaintiffs described as four instructions (Nos. 4 through 7) on nondelegable duties of landowners for dangerous conditions and the vicarious liability of a landowner for the negligence of independent contractors. During the instruction conference at the end of trial, the court refused special instruction Nos. 1 to 3, and plaintiffs withdrew Nos. 4 and 9. After argument, the court refused Nos. 5 and 6, and did not see how No. 7 was applicable to the facts of the case.

On the following day, plaintiffs withdrew No. 7 in favor of a new instruction, No. 10, which read: "The duty which a possessor of land owes to others to put and maintain it in reasonably safe condition is nondelegable." (As authority, instruction No. 10 cited *Brown v. George Pepperdine Foundation* (1943) 23 Cal.2d 256, 260 [error to instruct that negligence of elevator repairman could not be imputed to landowner, because duty to maintain land in safe condition nondelegable], *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726-728 (*Srithong*) [discussing vicarious nature of nondelegable duty to maintain property in safe condition—as a result, landlord's liability for noneconomic damages resulting from roof repairman's negligence not limited under Civ. Code, § 1431.2] and Rest.2d Torts (1965) § 422, p. 405 [noting, however, in com. b that rule applies to harm caused by unsafe condition of a *structure* (accord, 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1215, pp. 591-592)].)

Plaintiffs also offered a new instruction No. 11, which read: "A person who owes a duty to exercise reasonable care for the safety of others and who employs an

7

independent contractor to perform work, but who retains control of any part of the work, is liable for physical harm caused by the failure to exercise his or her control with reasonable care." (No. 11's supporting authority was *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 32-33, 36 [discussing rule of negligent exercise of retained control in general, but refusing to apply it where contractor's affirmative conduct did not create or add to risk of injury and subcontractor was immune under workers' compensation law from liability to injured employee] and Rest.2d Torts, § 414, pp. 387-388 [which notes in com. b that the rule principally applies to construction contractors and subcontractors].)

Eastland argued the provision of security services was not among a landowner's nondelegable duties. Food 4 Less argued that as a lessee it could not have a nondelegable duty, and did not retain any type of control over the lighting system when it hired Hussman.

The trial court refused both special instructions (Nos. 10 & 11), making reference to (1) it being only a landowner who has a nondelegable duty, (2) the doctrine's purpose of ensuring that an injured party receives compensation, and (3) the deep pockets of the settling defendants whose actions were the basis of plaintiffs' theories.

In plaintiffs' motion for a new trial, they raised the issue of the court's refusal of these special instructions. They conceded the evidence did not support a claim of direct negligence on the part of either remaining defendant—negligence in the hiring of Delta or Hussman, or negligence in ceding control of the lighting to Food 4 Less. As a result, plaintiffs claimed they were prejudiced when the court refused to instruct on nondelegable duties as a basis for vicarious liability. The trial court rejected this argument, asserting vicarious liability was an "unfair" theory of liability after plaintiffs had settled with Delta and Hussman.

8

## B. *Instruction No. 10*

1. Eastland.

Relying on the general principle that the duty of a landowner to protect others from injuries arising out of the condition of the property is nondelegable (*Srithong*, *supra*, 23 Cal.App.4th at p. 726; Prosser & Keaton*,* Torts (5th ed. 1984) § 71, pp. 511-512), plaintiffs argue the duty to protect customers from the criminal assaults of third parties is simply another aspect of this duty and thus should also be nondelegable. To this end, they cite a number of decisions in other states reaching this conclusion.

As with the conclusion that a duty exists, the conclusion that an existing duty is nondelegable is a question of law. (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1184 (*Summers*).) It is ultimately a policy question with undefined criteria, which several sister states have described as requiring a sui generis answer on a case-by-case basis. (*Funk v. General Motors Corp.* (1974) 392 Mich. 91, 101-102 [220 N.W.2d 641, 645]; *Breeden v. Anesthesia West* (2003) 265 Neb. 356, 363 [656 N.W.2d 913, 920]; see *Kleeman v. Rheingold* (1993) 81 N.Y.2d 270, 275 [614 N.E.2d 712, 716]; see also Prosser & Keaton*, supra*, § 71, pp. 511-512 [ultimate concern is need to protect community].) As *Srithong* explains, the concern in California courts is to assure that compensation is available for the injured party. (*Srithong*, *supra*, 23 Cal.App.4th at p. 727.)

However, California has treated the liability of landowners for third party criminal conduct *differently* than the general duty to maintain property in a safe condition; a court must balance the foreseeability of harm against the costs and burden of protecting against the harm, and thus a heightened degree of foreseeability (established through prior similar incidents or other probative evidence) is necessary to warrant anything more than simple security measures. (*Casteneda v. Olsher* (2007) 41 Cal.4th 1205, 1213-1214; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 243, 244 (*Delgado*).) The provision of security guards in particular is considered an "onerous" duty. (*Delgado*, at pp. 243-

9

244, fn. 24.)  Plaintiffs fail to demonstrate whether the out-of-state decisions on which they rely have a similar concern for this burden on a landowner.  Therefore, it is questionable whether a landowner who is not otherwise negligent in hiring a *licensed* security firm (which thus subjects the firm to the oversight of the state's licensing authority and assures protection of the public (see *Borg-Warner Protective Services Corp. v. Superior Court* (1999) 75 Cal.App.4th 1203, 1210-1211)) that has the resources to compensate parties injured through any negligent provision of security services should be held to the additional burden of vicarious responsibility for the security firm's failings.

We do not need to resolve the question, however.  As proposed by plaintiffs, instruction No. 10 simply states a general principle about nondelegability without expressly stating that Eastland in fact owed this duty to plaintiffs, the nature of this duty, the elements establishing a breach, and the resulting rule of vicarious liability.  (*Summers*, *supra*, 69 Cal.App.4th at pp. 1186-1187 [insufficient to instruct merely that nondelegable duty applies to a private carrier, the breach of which subjects it to vicarious liability; must expressly inform jury that defendant has this duty; see Judicial Council of Cal. Civ. Jury Instns. (June 2010 rev.) CACI No. 3713 [expressly stating defendant at trial has nondelegable duty, its source, and elements establishing breach].)  Even if this was not the basis for the trial court's ruling, on appeal our review of the legal accuracy of instructions is de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Plaintiffs assert that the jurors could correlate instruction No. 10 with the instructions on the direct negligence of Eastland.  We do not agree.  A lay juror cannot be expected to discern the elements relevant to a theory of *vicarious* liability (a theory that plaintiffs do not identify as covered in any other instruction) for a nondelegable duty from the general negligence instructions.  Plaintiffs also suggest the trial court had an obligation to give their incomplete instruction.  "Where, as in the case at bench, [a] modification to the proffered instructions require[s] . . . major changes to cure [them,]

10

such changes are best left to counsel submitting the instructions. It would not serve the impartial role of the trial judge to [make] such major changes," particularly if a pattern instruction adequately states the applicable principles. (*Wank v. Richman & Garrett* (1985) 165 Cal.App.3d 1103, 1114; accord, *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 [court may properly reject defective instructions without making modifications to them].) Finally, plaintiffs suggest trial counsel could have explained the necessary legal principles in closing argument. The arguments of counsel cannot be a substitute for a proper instruction from the trial court. (*Carter v. Kentucky* (1981) 450 U.S. 288, 304 [67 L.Ed.2d 241, 253].) As a result, the trial court was correct in refusing to apply instruction No. 10 to defendant Eastland.

2. Food 4 Less.

As noted, at trial plaintiffs asserted only the theory of a nondelegable duty on the part of Food 4 Less to provide adequate lighting as a basis for instruction No. 10. In their opening brief, plaintiffs asserted that Food 4 Less *negligently undertook to assume Eastland's* nondelegable duty to prevent unsafe conditions with respect to the lighting of the parking lot, and thus instruction No. 10 applied. They invoke Restatement Second of Torts, section 324A, comment d, pages 143 to 144 (the comment giving the example of an agent who takes charge of a landowner's building and whose negligent maintenance causes injury to a third party) and *Williams v. State of California* (1983) 34 Cal.3d 18, 23 (discussing nature of rule of liability for negligently rendered aid that either increases the risk of harm or induces reliance that results in harm (citing Rest.2d Torts, §§ 323, 324)).[4] In their reply brief, plaintiffs change tacks yet again and discuss how the general duty of due care (Civ. Code, § 1714) supports application of instruction No. 10.

---

[4] Our state Supreme Court's *Delgado* distinguished Restatement Second of Torts, section 323 as involving negligent undertakings directly involving another person, while section 324A involves negligent undertakings that injure third parties. (*Delgado*, *supra*, 36 Cal.4th at p. 249, fn. 28.)

11

Regarding plaintiffs' original theory in the trial court, to the extent we assume Food 4 Less could have its own duty to provide adequate lighting for the safety of others on land outside of their leasehold because they had control of the lighting (*Johnston v. De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394, 401 [though tenant not ordinarily liable for injuries incurred in areas outside leasehold, control of the lighting of unleased areas demonstrates evidence of at least limited right of control and thus liability for dangerous condition resulting from lack of adequate lighting]; cf. *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 832, 834 [control over maintenance of parking strip in city street easement sufficient to impose liability for injury on county]), which *might* be nondelegable because it is less onerous than the provision of security services, instruction No. 10 has the same shortcomings with respect to Food 4 Less as we have described above in connection with Eastland: Instruction No. 10 fails to include all of the elements a jury must find to impose vicarious liability for a nondelegable duty. (See p. 10, *ante*.) On this basis, the trial court's ruling refusing the instruction was correct.

Regarding negligent undertaking, plaintiffs cannot adopt a new legal theory on appeal. (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 872-873.) Even if we were to entertain the argument, once again instruction No. 10 is inadequate. The *scope* of the undertaking that a defendant assumes is a question of fact that a jury must resolve. (*Delgado*, *supra*, 36 Cal.4th 224, 249-250 [noting that mere hiring of guard does not of itself establish that there was an undertaking to protect third parties, nor does hiring guard to protect interior of itself establish duty to protect those who are outside]; *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 615 [while existence of duty a question of law, nature and extent of undertaking out of which duty arises is question of fact]). Instruction No. 10 does not require the jury to consider this issue (and plaintiffs do not identify any other instructions that would embrace it). Nor does instruction No. 10 include *any* of the other elements a jury must find to impose liability for a negligent undertaking. (*Artiglio*,

at pp. 613-614 [services rendered are of a kind actor should recognize as for protection of third parties; actions breached duty assumed; breach resulted in damages; and either act of negligence increased risk of harm, or resulted in detrimental reliance causing harm, or breached the assumed duty to the third person].)  Accordingly, the decision to refuse the instruction was proper even under this theory.[5]

### C.  Instruction No. 11

Plaintiffs concede that instruction No. 11 does not have any application to Food 4 Less.  As for Eastland, it points out in its brief that instruction No. 11 on its face applies only in the context of liability for *its negligent exercise of control* over a contractor, and does not address in any fashion the concept of *vicarious liability* for the *negligence of the contractor*.  Plaintiffs do not offer any rebuttal to this argument.  Because instruction No. 11 does not give any guidance on Eastland's vicarious liability for a nondelegable duty, the trial court correctly refused it.

## II.  No Prejudice from Limitation on Evidence of Prior Incidents

Given our disposition of this issue, we do not need to belabor the underlying procedural background.  At his deposition, plaintiffs' expert had supplied an exhibit containing dozens of purported previous criminal incidents in the mall parking lot, identified only by date under the headings of different penal provisions.  Before trial, Eastland moved in limine for the trial court to decide which of these incidents could properly be included in the expert's testimony as a basis for his opinion that Eastland and Food 4 Less had breached their duty to provide security and lighting.  The court stated this would be the subject of a foundational hearing (Evid. Code, § 402) before the expert

---

[5]  Already having been lenient with plaintiffs in connection with the new theory of negligent undertaking, we will not further indulge them by considering their arguments raised for the first time in their reply brief.  (*Sourcecorp, Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061, fn. 7.)

testified.  As its criterion, the court intended to screen the incidents for those reflecting violence:  "[I]t doesn't have to be murder.  It's got to be violent"; "it may be such that there is a duty because of the number of them, the severity of them because they are violent"; "if we get significant enough of them . . . there is basically a duty . . . to be reasonable in the way they secure and protect . . . ."

At the ensuing foundational hearing, the expert brought a new exhibit of 30 incidents that included the underlying circumstances from police incident reports.  He admitted he took the incident reports on face value without further investigation (such as whether it was a false report, as a police officer apparently testified at a deposition with respect to one of the included serious incidents).  At the conclusion of the hearing, the court excluded "things . . . like the shoplifting, purse snatching, I don't think that rises to the level of what we're talking about here, but there's other things there that have violence with [them]."  It concluded that the expert should be allowed to offer his opinion "but not use everything he put on this list."  After reviewing the police incident reports for itself, the trial court identified 12 serious incidents that it would allow the expert to include in his opinion at trial (which we related above).

Plaintiffs argue at length that the trial court applied the wrong legal standards in excluding the other 18 prior incidents (and consequently abused its discretion) because those were relevant not just to establish a duty of care to provide security, but also to the issue of breach of that duty.  Their analysis of prejudice, however, is limited to the assertion in a single sentence that "[h]ad the jurors heard evidence of the full extent to which Eastland was plagued with crimes against tenants and patrons . . . , there is a reasonable probability that they would have found Eastland negligent" (and a second sentence reiterating this statement in different words).

As defendant Eastland correctly responds, "Plaintiffs fail to explain how reference to an additional 18 less violent and less relevant incidents . . . would have caused the jury

14

to reach a different verdict. Because the expert was able to offer his opinion without limitation based on the dozen incidents allowed by the court, there is no prejudice . . . ." We agree. A dozen incidents are more than sufficient to support the expert's opinion that Eastland breached its duty of care to provide adequate security. Plaintiffs fail to explain how their expert's opinion, based on the most relevant and serious incidents, becomes more persuasive with cumulative evidence of more minor incidents. Their generalized claim of prejudice is insufficient to satisfy their burden on appeal. (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) We thus find they have failed to establish prejudice, and as a result we do not need to address the merits of their argument.

### III. No Prejudice from Exclusion of Evidence of Habit

Again, given our disposition of this issue we do not need to belabor the underlying procedural background. At the outset of trial, defendants sought to exclude the testimony of decedent's widow that her husband would never voluntarily go back inside the store after locking up. The court tentatively agreed that unless she could satisfy the foundation for habit evidence, it would not allow the testimony. More than two weeks later at a foundational hearing in the midst of trial, plaintiffs presented a series of witnesses (other family members) who offered anecdotal evidence of occasions on which they had been with decedent after he had locked up and then refused either their requests or someone else's to reopen the store for various purposes.[6] The trial court did not believe that this was sufficient to establish that decedent would never reopen the store for a valid business reason as opposed to the personal convenience of someone else. (It also noted in denying

---

[6] Two of the proposed witnesses also intended to testify to decedent's statements that he would never go back in to the store (once pointing out a fistfight in the parking lot as the reason for his habit). Counsel represented that the proposed witnesses would testify this was also his habit at home.

15

a motion for new trial that these few anecdotes were not probative of a habit in light of the 2,000 times or so that decedent had gone through the process of locking up the store.)

On the following day, plaintiffs offered three additional witnesses who had arrived at the store just after closing, two of whom wanted to cash personal checks and one of whom wanted to cash a check to make a payment on his account; in each instance, decedent refused to unlock the door.  The court excluded this evidence as well, in part because plaintiffs had never disclosed these witnesses before trial, and in part because two of the witnesses' experiences again involved personal convenience.

Evidence of habit, which is repeated instances of identical responses to a specific situation, is admissible to prove that conduct on a particular occasion was consistent with the habit.  (Evid. Code, § 1105; 2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2011) Evidence of Character, Habit, and Custom, §§ 35.61, 35.64, pp. 854.3, 854.4.) There must be an adequate sample of uniform responses, although specific standards for determining adequacy do not exist.  (2 Jefferson, § 35.65, p. 854.5.)

As illustrated in the 1982 edition, Jefferson noted the distinction between a daily rider of a bus testifying that the driver "habitually" failed to observe a stop sign (which establishes habit), as opposed to testimony of observations only on "many occasions" (which is inadequate to *establish* a habit, though adequate to *rebut* a proffered habit). (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) Character, Habit, and Custom, § 33.8, cf. illus. 1 & 2, pp. 1270-1271.)  A trial court's discretion is thus exercised somewhere between the boundaries of evidence that establish a "semiautomatic" response (the possibly extreme standard that appears in McCormick's evidence treatise, cited in *Webb v. Van Noort* (1966) 239 Cal.App.2d 472, 478) and nine incidents with patients out of a total of 45,000 examinations (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926), which is far below *any* reasonable standard.  In abbreviated manner (with equally abbreviated responses from defendants), plaintiffs contend they

16

satisfied these standards and therefore the trial court abused its discretion in excluding the testimony, which "was directly relevant to causation." Again, plaintiffs limit their analysis of prejudice to one sentence: "There is more than a reasonable probability that admitting the evidence of [decedent's] steadfast habit would have resulted in a verdict for the family."

In the first place, all parties in their analyses of this issue seem to overlook the testimony we related above, in which plaintiffs' expert asserted that those in the jewelry industry customarily will not reopen a store after locking up, and the employee testified that she had never seen decedent reopen the store after locking up. Thus, no one explains why this testimony would not have provided a basis for plaintiffs to argue habit even in the absence of the excluded witnesses.

More importantly, as defendants correctly maintain, exclusion of evidence relevant only to the issue of *causation* could not possibly be prejudicial, since the jury never reached the issue after finding neither defendant was negligent. Plaintiffs' sole riposte is to request that we reach the merits of the issue for the guidance of the trial court on retrial. As we are affirming the judgment, we do not need to offer any guidance. We therefore reject the claim of prejudice without the need to reach the merits of this issue.

17

## DISPOSITION

The judgment is affirmed.  Defendants Eastland and PAQ, Inc., are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                _____BUTZ_____, J.


We concur:


_____ROBIE_____, Acting P. J.


_____HOCH_____, J.

18