Filed 4/23/15  P. v. Vega CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C072642 |
| Plaintiff and Respondent, | (Super. Ct. No. 115481A) |
| v. | |
| JOSE ANTONIO VEGA, | |
| Defendant and Appellant. | |

Following a mistrial where the jury was unable to reach a verdict on any count, a second jury convicted defendant Jose Antonio Vega of first degree murder and premeditated attempted murder (finding he committed both while personally firing a gun in gang-related activity), being a felon in possession of a gun, and the substantive offense of gang-related activity. The court sentenced him to state prison for a determinate term

1

on the two nonhomicide offenses, with consecutive indeterminate sentences for the murder and attempted murder (and their firearm enhancements) of 82 years to life. It stayed the two enhancements for gang-related activity because the underlying offenses carried longer minimum sentences. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238.)

On appeal, defendant raises the issues of whether sufficient evidence of gang-related activity supports the substantive gang offense (count 4) and the stayed gang enhancements. He also argues the hearsay evidence on which a gang expert based opinions violated his right to confrontation. He further contends (for the first time on appeal) that the prosecutor committed misconduct while cross-examining him and during closing arguments (alternately asserting trial counsel did not provide effective assistance in failing to object). He claims trial counsel was also ineffective in failing to move to limit the scope of the gang evidence. The People properly concede the first point—the sufficiency of evidence to support the substantive gang offense. We shall reverse the conviction for the gang offense with direction to dismiss the count, and affirm as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

The two teenaged victims spent July 26, 2010, barbequing, drinking, and taking controlled substances throughout the afternoon and evening. In the early evening, they heard a group of people in front of an apartment complex down the block shouting and making hand signals in promotion of a particular gang. The surviving victim later recalled that one of the group was wearing a blue-and-white plaid shirt. From what he could see of their faces at this distance, he did not recognize anyone. Although he did not participate in gang activities, the surviving victim was aware of the hand signal associated with a rival of this gang, and "stupid[ly]" made the gesture and shouted the

2

name of the rival gang in the direction of the group. This was the extent of the interaction at that time.

In the small hours of the following morning, the victims decided to walk to a nearby convenience store after returning from a friend's home in order to get a cigar to use as a marijuana smoking device. As they approached the store, a man came out from between two buildings and abruptly began to shoot at them without any provocation. The surviving victim, 18-year-old Jeffrey A., noticed the man was wearing a blue-and-white plaid shirt, but could not remember anything about the shooter's face. He ran to the convenience store for help; his friend, 19-year-old Derrick Gann, fell in the street, gravely wounded. The police arrived shortly after 4:00 a.m. A bullet had severed two major arteries in Gann's abdomen, causing massive bleeding. Almost half of his blood supply poured into his abdominal cavity, his heart stopped and he died within an hour. Jeffrey A. was hospitalized for a week with an abdominal bullet wound.

A resident living close to the convenience store had been outside helping a friend change the oil in his car. He heard shots from the direction of the store. Suddenly a man (whom he identified at trial as defendant) ran into the yard of the neighboring apartment complex and tried to push through the fence into the yard of the resident's apartment complex. The resident told him to stay out. Defendant was wearing the blue-and-white plaid shirt that was an exhibit at trial. He claimed someone was shooting at him. The resident could hear approaching police sirens. Defendant eventually entered the neighboring apartment complex.

A unit in this apartment complex was a "flophouse," open to anyone who would share controlled substances with the tenants. Everyone in the apartment was busy packing in anticipation of an eviction later that day. There were a number of people present. One of the people who had been staying with the tenants was outside smoking marijuana when he heard the gunfire. He saw a man in a blue-and-white plaid shirt run

3

toward the rear of the apartment complex from the vicinity of the shots, but lost sight of him. The man (whom the witness identified as defendant) ultimately came into the apartment where everyone was gathered, and introduced himself as "Spanky" from Salinas. He told them that he had shot someone and needed to run. Defendant took a shirt from the witness and offered him the blue-and-white plaid shirt in exchange. In the process, the witness thought he saw a gun on defendant's person. The witness later gave the shirt to a detective.

Before he died, Gann spoke with his grandmother about the shooting shortly after surgery but he was still groggy. She told detectives that he said there had been two unknown attackers; she did not mention anything about the clothing. At trial, she was not sure whether or not her grandson had in fact described the color of the shirt one of the men was wearing.

On July 29, a detective went to the hospital and showed Jeffrey A. a single photograph, which was defendant's driver's license picture.[1] Jeffrey A. did not know the identity of the person, but apparently said he had been among the group of people down the block making gang references.[2] Jeffrey A. did not initially identify the person as also being the shooter. However, toward the end of the interview Jeffrey A. apparently said that the person was also the shooter. In an August 1 interview, Jeffrey A. mentioned only that defendant had been part of the group down the block. The detective brought a photo

---

[1] Having already heard from "numerous" sources that the suspected shooter was a man called "Spanky" from Salinas, who was a gang member and recently paroled, detectives had determined from their databases that this information matched defendant. They provided photo lineups to occupants of the flophouse, who identified defendant, and obtained an arrest warrant for defendant on July 30.

[2] At trial, Jeffrey A. did not have any recollection of his statements to the police. The prosecutor attempted to refresh his memory with the detective's report of his statements, a copy of which we have not located in the record.

array to Jeffrey A. on August 3 that apparently included defendant's picture. Jeffrey A. did not identify anyone, and said he did not know if he would be able to identify anyone from the earlier confrontation or the shooting. However, when shown the shirt that the witness had given to detectives, Jeffrey A. remembered the shooter wearing it. At this point in time, Jeffrey A. was uncertain whether anyone in the group down the block had been wearing it.

DNA retrieved from the shirt was consistent with defendant's. Gunshot residue on the shirt indicated it had been within two to 15 feet of a discharged firearm.

On his arrest, defendant confirmed being a member of a subset of the umbrella gang that the group down the block had been venerating, but he lived in Ripon. His daughter lived in Manteca with her mother, and he had been staying in various places near them. He denied having any knowledge of any shootings or being at the scene. He had spent July 26 drinking and smoking marijuana with various vaguely described individuals at various vaguely described locations, winding up at a construction site in the small hours of Tuesday morning, where he waited for his child's mother (now his wife) to pick him up. Defendant acknowledged wearing the blue-and-white shirt earlier on Monday, but it was gone when he woke up after passing out in a park. He claimed the people from the flophouse who had identified him were setting him up.

Defendant testified at trial. He had been a member of a subset of the gang since his youth in Salinas and Hayward. He has an abundance of gang-referencing tattoos. He was not part of the group of gang devotees with whom the victims had interacted earlier in the evening; he had left Manteca about 6:00 p.m. and received a call from his now wife around 7:30 p.m. while he was in Ripon. He returned to Manteca in the company of a friend about 9:00 p.m. He was wearing the shirt Jeffrey A. had described.

Defendant eventually parted ways with his companions; it was too late to call his wife, so he decided to go to a different apartment in the flophouse building to meet with

5

his supplier and buy methamphetamine; he did not know anyone else in the building. The supplier told defendant to go wait on the corner near the convenience store for one of the supplier's sellers (whom the supplier had pointed out to defendant in the past); defendant decided to wait in an alley between buildings rather than out in the open. The seller arrived, and handed defendant the drugs. Just then, the victims walked past the alley. As defendant stood close by, the seller abruptly turned and started firing at the victims. The seller moved toward the victims. Defendant ran off in the other direction and heard additional shots fired as he headed to the flophouse building. He thought the seller might be shooting at him for running off without paying.

He tried to jump over the fence, at which point he had the exchange to which the oil-changing neighbor had testified. The flophouse occupants then invited him into their apartment. He abandoned his shirt to avoid detection; he was wearing another underneath. He did not have a gun with him, and did not have one at home. The witness had observed his metal marijuana pipe. Eventually, he left the apartment and went to the home of a friend in order to call his wife, who came to pick him up and take him back to Ripon.

He had not told the truth in the police interview because he feared retaliation from other gang members. In point of fact, after previously testifying about the drug seller (in his first trial), gang members beat him up in jail.

## DISCUSSION

### 1.0  The Conviction and Enhancements for Gang-related Activity

#### 1.1  The Evidence Is Insufficient to Support the Conviction

The offense of active participation in a criminal gang (Pen. Code, § 186.22 subd. (a))[3] requires as an element "that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."  (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132 (plur. opn. of Corrigan, J.); *id*. at pp. 1139-1140 (conc. opn. of Baxter, J.).)  The People concede that this decision, rendered after entry of judgment in the present case, applies retroactively because it established the meaning of a statutory enactment and did not overrule controlling authority or a uniform body of law.  (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1023.)

There is an absence of any evidence of the participation of any additional gang members in the murder and attempted murder.  While defendant testified he experienced retaliation from gang members for naming the actual shooter in his previous trial, he did not testify that his purported supplier's seller was in fact a member of his gang.  The People properly concede that we must as a result reverse the conviction and direct dismissal of count 4, resulting in an eight-month reduction of the determinate term.  We also will direct the trial court to issue an amended determinate abstract of judgment.

#### 1.2  The Evidence Is Sufficient to Support the Enhancements

As noted, the trial court stayed the gang enhancements, which the minimum terms for his indeterminate sentences exceed.  Defendant asserts the enhancements are nonetheless material because they could have adverse consequences at a parole hearing. (See *People v. Johnson*  (2003) 109 Cal.App.4th 1230, 1238.)  In anticipation of that possibility, we will address his readily dispatched claim.

---

[3]  Undesignated statutory references are to the Penal Code.

7

The principle that a lone actor cannot commit the substantive offense of gang participation does not apply to the enhancement provision for gang-related activity. (*People v. Rios* (2013) 222 Cal.App.4th 542, 546, 564.)  Instead, defendant argues the evidence is insufficient because it did not establish that he committed the offenses for the benefit of (or in association with) *the particular subset* of the umbrella gang organization to which he belongs.  As we resolve this legal question against defendant (and he does not argue the evidence is *otherwise* insufficient), we do not need to summarize the facts introduced on the issue.

The first element of a gang enhancement requires evidence that a defendant committed an offense for the "benefit" of (or in "association with") a criminal gang. (§ 186.22, subd. (b)(1).)[4]  This necessarily requires proof of the *existence* of the criminal gang, which involves evidence of three or more persons associating under a common name or insignia with a primary activity of committing at least one criminal act specified in the statute, and proof of members of this association who engage (alone or together) in a "pattern" of gang activity involving two or more of the specified criminal acts.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*); § 186.22, subds. (e) & (f).)

We have previously noted it is sufficient for a prosecutor to prove the goals and identifying characteristics of an umbrella gang entity as proof of the existence of a criminal gang without further establishing these criteria for the particular subset to which a defendant belongs, where there is an absence of any evidence that the two entities have divergent goals or activities.  (*People v. Ortega* (2006) 145 Cal.App.4th 1344, 1357.)  *In re Jose P.* (2003) 106 Cal.App.4th 458 similarly rejected the claim of a need generally to establish that the particular subset has the characteristics of a criminal

---

[4]  Although the statute has been amended since defendant's commission of his offenses, the material provisions are unchanged and thus we cite to the currently effective statute.

gang; it distinguished its earlier decision to the contrary as resting on evidence demonstrating an ad hoc collection of subgroups *along with expert opinion that their umbrella organization was not itself a gang.* (*In re Jose P.,* at p. 467, limiting *People v. Valdez* (1997) 58 Cal.App.4th 494, 508-509.)[5]

Defendant pins his argument on *People v. Williams* (2008) 167 Cal.App.4th 983, which recognized that "Evidence of gang activity and culture need not necessarily be specific to a particular [subset] as opposed to the larger organization." (*Id.* at p. 987.) However, "having a similar name is, of itself, [in]sufficient to permit the status or deeds of the larger group to be ascribed to the [subset]." (*Ibid.*) "In our view, *something more* than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal . . . gang. Instead, *some sort of collaborative activities or collective organizational structure* must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Id.* at p. 988, italics added.) We note that the expert evidence in *Williams* indicated that the umbrella gang and the subsets at issue "are not typically organized like other criminal . . . gangs . . . : for the most part, they have no constitution, and are a looser organization with a less well-defined rank structure. [The] groups get together more for bragging than for strategizing, and one group . . . will not necessarily know what another group is doing." (*Id.* at p. 988.)

To the extent *Williams* is tied to this expert testimony, we do not necessarily have any quarrel with its conclusion *in the context of that particular case.* (Cf. *In re Jose P.*, *supra*, 106 Cal.App.4th at p. 467 ["the expert testimony in *Valdez* was evidence in that

---

[5] The Supreme Court presently has the issue under review in a subsequent decision of this court. (*People v. Prunty* (2013) 214 Cal.App.4th 1110, review granted June 26, 2013, S210234.) The case has been fully briefed since January 2014.

case, not this one"].)  However, as a general proposition of law, we cannot agree.  This adds an element to the statute that the Legislature did not include, something from which a court should refrain absent constitutional compulsion.  (See *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 658-660.)[6]  The Legislature *could have* but *did not* require proof of what we might term a "franchise" model.  Rather, the statute specifically provides that the association can be "formal or informal."  (§ 186.22, subd. (f).)  It thus seems evident the Legislature concluded that a "booster club" model is sufficient.[7]  As a result, actively espousing a name or insignia shared with an umbrella gang is sufficient to allow proof of the umbrella organization's status as a criminal gang in order to establish the gang-related nature of a defendant's offenses for purposes of the enhancement, absent evidence of divergent goals or activities.  Defendant does not identify any such evidence in the present case.  His argument fails as a result.

## 2.0  The Admission of Evidence for the Basis of the Gang Expert's Opinion

Defendant maintains that while the gang expert "did not always specify the source of his information, the only reasonable inference to be drawn from his testimony is that many of the 'facts' he was relaying came from police reports or other testimonial

---

[6] *Williams* did not identify any such constitutional concerns driving its analysis.  In offhand manner, defendant invokes due process, with a citation to *Scales v. United States* (1961) 367 U.S. 203, 225-226 [6 L.Ed.2d 782].  This citation does not inform the nature of the argument in the present context, as it describes the abstract sliding scale under due process on which the membership in a group (there, the Communist Party of the United States) allows for vicarious liability for any criminal acts of the group.  We will not pursue this line of argument further sua sponte.  (*Sourcecorp, Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061 & fn. 7.)  His invocation of *Boyle v. United States* (2009) 556 U.S. 938, 947, fn. 4 [173 L.Ed.2d 1265] in his reply brief is both too belated (*Sourcecorp*, at p. 1061, fn. 7) and inapposite, as it involves a hypothetical in connection with *interpreting an instruction* on a federal racketeering statute.

[7] "Boosters" provide sufficient danger on their own without formal allegiance, as the incidents of violent conduct at sporting events sadly demonstrate (such as the near fatal beating of a San Francisco Giants fan at Dodger Stadium).

statements," thereafter specifying over the course of three pages particular portions of the testimony we do not need to relate here.  He then acknowledges *Gardeley*, *supra*, 14 Cal.4th 605, which held that the basis for an expert's opinion is not subject to the hearsay rule because it is not admitted for the truth of any assertions, and *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1131, which was critical of applying this holding in the context of the constitutional right of confrontation but concluded it was obligated to do so under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.  He contends, however, that the concurring and dissenting opinions in *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89] combine to create a holding contrary to *Gardeley*, which this court should follow to reverse the judgment for the admission of this prejudicial hearsay in violation of his right to confrontation.

However, in contending that trial counsel's failure to object on the basis of the confrontation clause did not result in a forfeiture, defendant admits "the statements in the concurring and dissenting opinions . . . w[ere] not a holding" on which trial counsel could have relied to raise the objection.  Absent a clear necessary premise of an opinion of the federal high court or a square holding to the contrary, the effect of *Gardeley* remains unchanged.  (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 956-957 [federal high court's "clearly decided" premise must be followed over contrary state holding]; *People v. Rooney* (1985) 175 Cal.App.3d 634, 644 [must follow California Supreme Court if federal high court "has never squarely ruled on the issue"].)  *Only* those portions of an opinion of the United States Supreme Court that are necessary to the result constitute the holding of the court.  (*Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 67 [134 L.Ed.2d 252].)  To treat the combination of a concurrence and a dissent as "necessary" to the result would be absurd.  While these opinions may *signal* a future holding, they do not have any value as precedent.  As a result, whether as a matter of compulsion or as a matter of policy in light of "our position in the judicial hierarchy"

11

(*People v. Hill*, *supra*, 191 Cal.App.4th at p. 1131), we will defer a ruling on defendant's argument to the *Gardeley* court, which has the issue presently before it. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681.)

**3.0 Defendant Has Forfeited His Claims of Misconduct**

Over the course of five pages, defendant identifies what he calls instances of the prosecutor's argumentative cross-examination of him. He also contends that in closing arguments, the prosecutor (1) impermissibly asserted that if the supplier existed, the defense would have subpoenaed him, that it was his personal decision to prosecute defendant, and that his office did not prosecute victims; (2) misstated evidence, and referenced extrajudicial evidence regarding police protocols; and (3) urged jurors to use gang evidence for purposes of propensity. He admits that "[e]xcept for trial counsel's objection to the prosecutor asking [him] whether a [member of his gang] committing torture would thereby gain respect, trial counsel failed to object to the prosecutor's [questioning and argument]."[8] However, in cursory fashion, he asks us to exercise our discretion to address forfeited contentions, suggests the relentless nature of the misconduct forced trial counsel to accede without objection, and baldly asserts "there [does not] appear to be [any] viable reason for defense counsel" not to object (without any further analysis).

Failure to lodge a contemporaneous objection *and* a request for an admonition forfeits any claim of prosecutorial misconduct, except where a defendant affirmatively establishes that it was irremediable or it was futile to object, with more than a "ritual[ized] incantation" to this effect. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Defendant has not established futility on the present record. *People v. Jones* (1997)

---

**8** The objection was to the form of this hypothetical question. Following an unreported sidebar conference, the trial court asked the prosecutor to rephrase, and defense counsel did not renew his objection.

15 Cal.4th 119, 181, observed that objecting at the outset could cut off any subsequent misconduct, and therefore having numerous instances of unobjected purported misconduct is not a basis for excusing forfeiture. *People v. Pitts* (1990) 223 Cal.App.3d 606, 692, is inapposite: "[E]arly on in trial, it became abundantly clear that any objections by defense counsel on the grounds of prosecutorial misconduct would be overruled and requests for admonitions denied or ignored." Defendant has failed to identify similar circumstances in his trial. Defendant also fails to particularize the manner in which the prosecutor's conduct could not have been the subject of an effective admonition.

Defendant's attempt to reach the issue under the guise of ineffective assistance of trial counsel fails in two regards. In the first place, direct appeal is almost inevitably the inappropriate forum for establishing that the inherently tactical choice of failing to raise an objection to misconduct fell below reasonable professional standards. (*People v. Lopez* (2008) 42 Cal.4th 960, 966, 972.) In the second place, defendant does not provide anything more than a perfunctory analysis of *how* the failure to object in each instance did not meet objective professional standards; "[t]his will not suffice" (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 466-467 [rejecting claim of ineffective assistance on this basis]). This is particularly true where trial counsel was in a position to observe the manner in which this trial unfolded in comparison with the first trial, and calculate whether any of the instances defendant identifies on appeal were of any moment. As a result, we will not countenance this exercise in frivolous second-guessing of trial counsel. If *in fact* trial counsel did not have any strategic basis for allowing the prosecutor's actions, defendant has a remedy in habeas corpus, if he can establish resulting prejudice.

Finally, although we have discretion to consider an issue regardless of forfeiture, this applies where it raises a question of law on such undisputed facts as appear in the record on appeal. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 415, pp. 473-474.) This is a

13

disfavored course of action; it is unjust to the opposing party, unfair to the trial court, and contrary to judicial economy (i.e., a waste of the time of the parties and the judicial branch) since it encourages the embedding of reversible error through silence in the trial court. (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873.) As a result, we ordinarily exercise our discretion to excuse forfeiture "rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) The circumstances of the present case hardly satisfy this stringent criterion. As a result, the claim of prosecutorial misconduct is not cognizable in this appeal.

**4.0  Trial Counsel Was Not Ineffective in Failing to Limit Gang Evidence**

In general, defendant faults trial counsel for not filing any "motions in limine seeking exclusion or limitation of the gang affiliation evidence." In particular, he (1) asserts defense counsel should have objected to much of the expert's testimony as "violat[ing] the basic limitations on expert witness testimony"; (2) reiterates his earlier argument that the "extensive testimonial [hearsay] materials" conveyed to the jury that defense counsel approved of such statements (recast in the guise of allowing "highly prejudicial" hearsay evidence); and (3) contends trial counsel allowed the expert to "paint *all* . . . gang members as uniformly violent sociopaths," give other opinions about gangs lacking any factual basis that the trial court would have excluded, and give unsupported testimony about defendant's gang participation. Finally, he asserts trial counsel should have prevented any references to the prison gang from which defendant's gang derives.

For the reasons we have just expressed above, we may plausibly posit on direct appeal that a reasonable defense attorney who had obtained a hung jury despite similar evidence in the previous trial (defendant not having articulated any distinction between the scope of the gang evidence in the two trials) would not have felt compelled to make an objection in the second trial. Defendant's claim of ineffective assistance thus fails.

14

## DISPOSITION

The conviction for the substantive gang offense is reversed with directions to dismiss the count (count 4).  The judgment is modified to strike the determinate term for that offense.  The trial court shall file an amended determinate abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


                                                  _____BUTZ_____, J.


We concur:


_____BLEASE_____, Acting P. J.


_____DUARTE_____, J.


15