Filed 2/16/22  Webb v. DSM Engineering Plastics CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MACHELE WEBB,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DSM ENGINEERING PLASTICS, INC. et al.,<br><br>    Defendants and Respondents. | A161544<br><br>(San Francisco City & County Super. Ct. No. CGC-19-574181) |

After her employment was terminated, plaintiff Machele Webb sued defendant DSM Engineering Plastics, Inc. (DSM) asserting several causes of action, including for disability discrimination and retaliation in violation of the California Fair Employment and Housing Act (FEHA).  She appeals from both the summary judgment entered in favor of DSM and the denial of her motion for a new trial.

Webb maintains the judgment must be reversed because DSM assertedly failed to establish pivotal facts: the identity of the person who actually made the termination decision, and his or her reasons for doing so.  She additionally maintains she raised a triable issue as to pretext, and the trial court abused its discretion in declining to entertain her "mixed-motive" theory, which she advanced for the first time in her new trial motion.  We affirm.

1

In March 2017, after a months-long recruitment process, Webb started in her position as a business development manager for DSM. Webb's base salary was $180,000 per year, and she received a $15,000 signing bonus. Webb spent most of her time travelling and otherwise worked from home.

During her first week of employment, Webb attended a company conference in Japan. She arrived late to the conference, and also arrived late to two events during the conference. Webb maintains she missed her connecting flight due to a weather delay and that her supervisor, Matt Marnell, preapproved her late arrival to the two events.

In any case, Marnell was concerned about Webb's apparent lack of professionalism at these events because she typed on her phone as he tried to introduce her to important colleagues. After the trip, Webb submitted various receipts that Marnell believed were efforts to obtain reimbursement for personal or family food expenses.

The following month, in April, Webb e-mailed Marnell two draft presentations related to the planning of another company event. Marnell found the work to be "incomplete, unusable work product," that "essentially shift[ed] responsibility to the rest of the team to 'fill in the blanks' and prepare the presentation for her."

On April 26, Webb e-mailed Marnell a list she had compiled of 26 customer targets for the following month. Webb either did not contact, or did not recall contacting, approximately half of the potential customers on the list.

On May 22, Webb sent Marnell a status update indicating, among other things, that she had conducted three customer visits with a fellow DSM

employee earlier in the month (on May 8). Marnell contacted the employee and learned the visits, in fact, never occurred.

On May 24, Webb overslept for a planning meeting. Marnell subsequently removed Webb from the project to which the meeting pertained. He also received negative feedback from the project team regarding their experiences working with her—she was a poor listener and communicator, lacked product knowledge, and had called another team member "not important." According to Webb, she was removed from that team to focus on a different project.

The following day, May 25, Marnell sent a text message to his supervisor regarding the negative feedback about Webb. Marnell was told to contact DSM Human Resources (HR) Vice President, Preta Stackhouse. He did so, and Marnell and Stackhouse arranged to meet the following week, on May 31.

At their May 31 meeting, Marnell and Stackhouse "discussed the litany of concerns" regarding Webb's performance and "agreed that the best option was to push the matter to closure and recommend termination of Webb's employment, subject to review by DSM's legal department." Stackhouse also advised Marnell to "compile" the list of concerns they had discussed at their meeting.

That same day, after his meeting with Stackhouse, Marnell had a call with Webb wherein she disclosed for the first time that she had suffered a detached retina from a work-related car accident earlier in the month, had a potential workers' compensation claim, and would be having surgery the next day. Marnell notified Stackhouse about the injury. Stackhouse, in turn, sent an e-mail to DSM HR Manager Kelly Heim asking if Webb had previously

3

reported the accident.[1]  Heim responded that she had not heard about it, but would follow up.[2]

A week later, on June 6, Marnell prepared the list of concerns with Webb's performance.[3]

Two days after that, on June 8, Marnell and Stackhouse met with DSM's legal department, which approved termination of Webb's employment.

That same day, June 8, Webb prepared an "Accident summary" document, indicating she would be restricted from driving for approximately one week and restricted from flying for approximately two to three weeks.

On June 13, a week after the legal department approved the termination of Webb's employment, Marnell met with Webb and told her she was being let go for poor performance.  Her employment ended later that week, on or about June 16.

A year and a half later, in February 2019, Webb filed a complaint against DSM and Marnell asserting seven causes of action under the FEHA:

---

[1]  Stackhouse's e-mail stated in its entirety:  "Hey Kelly, [¶] by chance do you know if Machelle Webb called in a car accident to Chris or Jon Miller.  [¶] I understand from Matt she had an accident on May 9th with a rental car, apparently now has to have emergency retina surgery and she is claiming it was part of the accident in the rental car?  Thinking Workers Comp here. . . ."

[2]  Heim's response stated in its entirety: "Patty, [¶] I haven't heard a single thing about it, but I will follow up in the morning and see what I can find out. [¶] Kelly."

[3]  This three-page document was entitled "90 Day Review–Machele Webb" and began as follows: "Machele's start at DSM and performance thus far have been poor.  She was hired as a seasoned business developer, but has presented herself poorly in the first 90 days.  Unfortunately, based on her performance, my recommendation is for termination."  The document then listed approximately twelve concerns, ranging from Webb's incomplete work product and misrepresentation regarding the customer visits, to negative feedback from other DSM employees and lack of professionalism.

(1) disability discrimination; (2) failure to engage in the interactive process; (3) gender/sex discrimination; (4) age discrimination; (5) retaliation; (6) harassment; and (7) failure to prevent harassment, discrimination, or retaliation. In October, Webb voluntarily dismissed her gender/sex and age discrimination claims.

Defendants moved for summary judgment on Webb's remaining causes of action.

The trial court granted the motion in its entirety. As to the discrimination and retaliation claims—the only claims Webb pursues on appeal—the court ruled defendants had satisfied their burden to show that DSM had determined Webb was a poor performer and that the "main decisionmakers," Marnell and Stackhouse, decided on May 31, 2017, to dismiss her subject to review by DSM's legal department. The court further ruled Webb made no showing that DSM's stated reasons for her termination were pretextual and motivated by discriminatory animus. While Webb was "formally terminated on June 8, preparations were well under way by May 31, and the decision to fire her was taken that day, before defendants knew of her injury." The court also ruled a supervisor like Marnell could not be liable for Webb's discrimination or retaliation claims—a ruling Webb does not challenge on appeal.

After judgment was entered for DSM and Marnell, Webb moved for a new trial. Among other things, she asserted the court erred in making factual findings and concluding she had not raised triable issues of fact. Webb also asserted, for the first time, that this was a "mixed-motive" case and she had raised a triable issue that her termination was caused, at least in part, by discriminatory bias. The trial court denied the motion. As to the mixed-motive theory, it ruled: " '[n]ew theories that could have been raised,

5

but were not, is not one of the causes that permits a new trial.' (*Ins. Co. of State of Pa. v. Am. Safety Indemnity Co.* (2019) 32 Cal.App.5h 898, 922–[9]23.)" This appeal followed.

## DISCUSSION

### *Summary Judgment*

#### *Standard of Review*

Our standard of review governing summary judgment is well-settled. "We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

"A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action." (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 864, citing Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) "If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of his or her pleadings, 'but, instead, shall set forth the specific facts showing that a triable issue of material fact exists.' " (*Thompson*, at p. 860.) "A triable issue of material fact exists 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid.*)

"While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor,

6

plaintiff's evidence remains subject to careful scrutiny." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.) "We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid.*) "A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981 (*LaChapelle*).)

### McDonnell Douglas *Test*

Discrimination and retaliation claims under the FEHA are generally analyzed using the three-step test developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 (*McDonnell Douglas*). (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) The employee has "the initial burden to establish a prima facie [showing] of discrimination." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) If the employee does so, the burden then shifts to the employer to produce "admissible evidence . . . that its action was taken for a legitimate, nondiscriminatory reason." (*Id.* at p. 355–356.) If the employer produces such evidence, the burden shifts back to the employee to "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful

action." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 553 (*DeJung*).)

In the context of summary judgment, an employer may satisfy its burden of proving a cause of action has no merit by showing either that one or more elements of the prima facie case "is lacking, or that the adverse employment action was based on legitimate nondiscriminatory factors." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038; see *Guz, supra*, 24 Cal.4th at p. 356; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, at p. 361; see also *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097–1098 [if a defendant employer's motion for summary judgment "relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred"].) " 'Circumstantial evidence of " 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate"

on an improper basis.' " (*Batarse v. Service Employees Internat. Union Local 1000* (2012) 209 Cal.App.4th 820, 834.)

### Prima Facie Showing

An employee alleging disability discrimination under FEHA must make a prima facie showing that she (1) suffered from a disability; (2) could perform the essential functions of the job with or without reasonable accommodation; and (3) was subjected to an adverse employment action because of her disability. (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 603.) This burden is " 'not onerous,' " but an employee "must at least show ' "actions taken by the employer from which one can infer, *if such actions remain unexplained*, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion.' " ' " (*Guz*, *supra*, 24 Cal.4th at p. 355, italics added.)

In its summary judgment motion, DSM did not dispute that Webb cleared the prima facie threshold given her reliance on evidence that she disclosed her detached retina and associated travel restrictions on May 31 and June 8, respectively, and her employment ended approximately two weeks later. Nor does DSM claim on appeal that Webb failed to make a prima facie showing. We therefore assume the burden shifted to DSM to present evidence of legitimate reasons for terminating her employment.

### Legitimate Reason for Termination

We therefore turn our attention to the second step of the *McDonnell Douglas* test: whether DSM produced competent evidence that Webb's employment was terminated for a legitimate, nondiscriminatory reason. (*Guz, supra*, 24 Cal.4th at pp. 355–356.)

Webb's principal argument on appeal is that DSM's motion for summary judgment failed at the starting gate because it assertedly failed to

establish who the "decisionmaker" was and why he or she (or they) made the decision to terminate Webb's employment. This argument appears throughout Webb's briefing and underlies most of her contentions on appeal.

Webb concedes she did not advance this argument in opposition to DSM's motion for summary judgment. Rather, Webb raised this asserted fundamental deficiency in DSM's evidentiary showing for the first time in her new trial motion. She maintains her belated challenge was proper—and she can therefore pursue this argument on appeal—citing cases such as *Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10 for the proposition that a trial court has discretion to consider a new legal theory made in a motion for new trial, "so long as the new theory presents a question of law to be applied to undisputed facts in the record." (*Id.* at p. 15.)

" ' "Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments." ' (*DiCola* [*v. White Brothers Performance Products* (2008)] 158 Cal.App.4th [666,] 676.) 'Though this court is bound to determine whether defendants met their threshold summary judgment burden independently from the moving and opposing papers, we are not obliged to consider arguments or theories, including assertions as to deficiencies in defendants' evidence, that were not advanced by plaintiffs in the trial court.' (*Ibid.*) 'Ordinarily the failure to preserve a point below constitutes a [forfeiture] of the point. [Citation.] This rule is rooted in the fundamental nature of our adversarial system: The parties must call the court's attention to issues they deem relevant. " 'In the hurry of the trial many things may be, and are, overlooked which could readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.' " ' (*North Coast Business Park v. Nielsen*

10

*Construction Co.* (1993) 17 Cal.App.4th 22, 28–29. . . .) 'Indeed, if this were permitted procedure, parties opposing and losing summary judgment motions could attempt to embed grounds for reversal on appeal into every case by their silence.' (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873. . . .)" (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 698.)

As these authorities make clear, a party opposing a summary judgment motion cannot remain silent as to whether, or why, the moving party has failed to carry his or her burden on any essential element, and then later maintain, for the first time after judgment has been entered, that the moving party failed to carry his or her burden. Indeed, plaintiff's delay in advancing the argument she now most strongly presses on appeal was significant. She filed her opposition to the summary judgment motion on January 10, 2020. The trial court granted the defendants' motion January 24. Judgment was not entered until May 6. Plaintiff did not file her post-trial motions until July 20. Thus, it was not until seven months after plaintiff filed her opposition and the motion was granted, that she asserted for the first time, after judgment was entered, that defendants' motion failed for the fundamental reason that they failed to carry their burden under the second step of the *McDonnell Douglas* test to show there is no triable issue as to who made the decision to terminate her employment and, thus, the reasons therefore. She thus failed to preserve this contention.

Even assuming Webb could properly advance her new claim for the first time in a new trial motion, we do not agree that DSM's motion was fatally deficient because DSM supposedly never identified who made the decision to terminate Webb's employment and thus never identified the reasons why her employment was terminated. The declarations of Marnell and Stackhouse establish that on May 25, 2017, Marnell alerted his

11

supervisor to serious concerns about Webb's performance, and on May 31, before Webb disclosed her retinal injury to Marnell, Marnell and Stackhouse discussed Webb's performance issues and "agreed that the best option was to push the matter to closure and recommend termination of Webb's employment, subject to review by DSM's legal department." That review was conducted on June 8, and on June 13, Marnell met with Webb and told her she was being let go for poor performance. Webb's employment ended on or about June 16. This evidence—which was uncontroverted—was sufficient to establish that Marnell and Stackhouse were the decisionmakers, their decision was approved by the legal department, and Webb's employment was terminated pursuant to that decision.

Although Webb insists this evidence does not suffice, she has never identified any other decisionmaker or presented any evidence that even arguably raises a triable issue in this regard. She expressly disclaims that the decision to terminate her employment was made by DSM's legal department. Instead, in her briefing, she posits that some other "unidentified" person must have made the decision, given that Marnell and Stackhouse stated they " 'recommended' " termination of Webb's employment. Webb's myopic focus on this single word, however, ignores the remainder of what Marnell and Stackhouse said—for example, that they "agreed that the best option was *to push the matter to closure*" (italics added)—as well as the entirety of Marnell's role in the process, including identifying and reporting the deficiencies in Webb's performance, contacting and consulting with Stackhouse, meeting with the legal department, preparing the written documentation of performance concerns, and meeting with Webb and informing her that her employment was being terminated for poor performance. (See *Horn v. Cushman & Wakefield Western, Inc.* (1999)

12

72 Cal.App.4th 798, 808 (*Horn*) [undisputed evidence as to defendant's extensive role in the termination of plaintiff's employment did "not provide substantial evidence from which one could infer" that another individual made the decision to terminate his employment]; see also *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048, 1054 ["Section 437c, subdivision (c) allows the trial court ruling on the motion to consider all evidence and all the inferences reasonably deducible from the evidence set forth in the papers, 'except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.' (§ 437c, subd. (c).)"].)

Webb's assertion that some other unidentified person was the decisionmaker, which at oral argument her counsel identified as Marnell's supervisor, is inconsistent with all the other undisputed evidence in the record and sheer speculation. It thus does not raise a triable issue of fact. (See *LaChapelle*, *supra*, 102 Cal.App.4th at p. 981 ["A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact."]; *Horn, supra,* 72 Cal.App.4th at p. 807 ["[A]n issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture."].)

Webb additionally maintains that even if DSM met its burden with regards to identifying the decisionmakers and their reasoning, the trial court nevertheless erred in purportedly making three factual "findings" that are "unsupported by evidence in the record" and which are "also the subject of triable issues of material fact."

13

The first of these unsupported findings, according to Webb, is that the decision to terminate her employment was made on May 31, 2017. In support of this claim, Webb rehashes her argument that, on that date, Marnell and Stackhouse only "recommend[ed]" Webb's employment be terminated, and points to DSM interrogatory responses that the termination decision was made on June 8. The evidence, however, was uncontroverted that the groundwork for Webb's termination was "well under way" even before May 31—Marnell had forwarded the negative feedback regarding Webb to his supervisor and had contacted Stackhouse in the HR Department. When they met on May 31, Marnell and Stackhouse agreed to "push the matter to closure and recommend termination," subject to review by the legal department, which occurred on June 8. After that, Marnell met with Webb on June 13 and informed her that her employment was being terminated for poor performance. This evidence was uncontroverted and established that the decision to terminate Webb's employment was made on May 31, subject to approval by the legal department, which was given on June 8. The decision was implemented on June 13, and Webb's employment ended on or about June 16.

The second finding Webb challenges as unsupported is that Marnell and Stackhouse made even a *recommendation* on May 31 to terminate her. In so doing, Webb appears to attack the truthfulness of Marnell's and Stackhouse's declarations regarding their recommendation. "[T]he purpose of the affidavit supporting a motion under [summary judgment] is to present verified facts to the court which, if uncontradicted or unexplained by facts set forth in opposition thereto, will constitute sufficient grounds to allow the court to determine that no triable issue of fact exists." (*Newport v. City of Los Angeles* (1960) 184 Cal.App.2d 229, 236.) In an attempt to contradict these

declarations, Webb points to (1) the absence of written documentation from the May 31 meeting; (2) the e-mail from Stackhouse to Heim, asking if Webb had previously reported her car accident but not mentioning the termination; and (3) that Webb had not been warned her job was in jeopardy. None of this, however, contradicts the competent, admissible evidence from Marnell and Stackhouse that they agreed on such a recommendation, particularly given the full complement of DSM's evidentiary showing, establishing the chronology of events that occurred and Marnell's participation in every step of process resulting in the termination of Webb's employment.

The third finding with which Webb takes issue is that she was "formally terminated on June 8," given DSM's interrogatory response that the termination occurred on June 16. Even assuming the trial court was mistaken as to the June date—on June 8, Marnell and Stackhouse met with the legal department and the department approved the termination of Webb's employment; on June 13, Marnell met with and told Webb she was being let go for poor performance; and on or about June 16, Webb's employment ended—the *pivotal fact* which is uncontroverted is that the decision to terminate her employment was made on May 31, before Webb gave notice of her detached retina and the temporary driving and travel restrictions. Accordingly, the trial court's apparent mistake as to the June date is immaterial and does not constitute reversible error. (See *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1146 ["If independent review establishes the validity of the judgment, then the error is harmless."].)

### *Pretext*

Turning to the third step of the *McDonnell Douglas* test, the question becomes whether Webb raised a triable issue by producing "substantial evidence" that DSM's stated reason for her termination—poor performance—

15

was untrue or pretextual. (*DeJung*, *supra*, 169 Cal.App.4th at p. 553.) Webb maintains she presented "significant pretext evidence," which combined with the "termination decision timing," raised a triable issue.

Webb relies on her own testimony in this regard. At her deposition, she testified that her late arrivals to the Japan conference and related events were due to weather or otherwise approved by Marnell. She also testified that she was removed from the planning team to focus on a different project. She maintains "the remaining performance complaints are so inconsequential that they are insufficient to sustain summary judgment." Not so.

Webb did not dispute, for example, that she failed to contact half of the customers on her target list for May 2017. Instead, she complained that she should have been given more time to reach the target that she, herself, set. Nor did she dispute that she sent a document to Marnell indicating she had conducted three customer visits, when, in fact, she had not done so. Instead, she blamed another co-worker for why these visits did not happen. Webb also did not dispute that Marnell found her work product "incomplete" and "unusable." Instead, she complained that she was not told about his reaction. Webb likewise did not dispute that Marnell received negative feedback from the team members regarding their experiences working with her. And, finally, Webb did not dispute that when she was at the conference, she used her phone while Marnell was trying to introduce her to important colleagues. In short, the bulk of DSM's evidence of Webb's poor performance was uncontradicted, and Webb's meagre response fell far short of raising a triable issue of pretext. (See *DeJung*, *supra*, 169 Cal.App.4th at p. 553.)

In *Guz*, for example, the plaintiff alleged he was terminated from his position supervising the company's overhead division because of his age. (*Guz*, *supra*, 24 Cal.4th at pp. 327–328.) The company president testified

16

that he decided to eliminate the division due to its size, work product, and budget overruns, and that other employees were chosen for open positions in another group based on specific skill sets and experience the plaintiff did not have. (*Id.* at pp. 359–360.) *Guz* concluded the plaintiff had not raised a triable issue of pretext because he had made "substantial *concessions to the truth*" regarding the company's proffered nondiscriminatory reasons for his termination. (*Id.* at p. 363.) As in *Guz,* Webb conceded the truth of much of DSM's evidence regarding her poor performance.

Webb's reliance on *Burns v. AAF-McQuay, Inc.* (1996) 96 F.3d 728 (*Burns*) is misplaced. In *Burns,* the plaintiff was demoted from secretary to switchboard operator. (*Id.* at p. 730.) She alleged the demotion was based on her supervisor's age-based animus, as he had told her " 'she did not "fit into [his] group," ' " accused her of " 'walking around like a "ten-year-old" even though she was sixty-five,' " questioned her about retirement plans, and threatened to demote her. (*Id.* at p. 732.) The supervisor testified that the plaintiff's unsatisfactory performance was linked with her "loss of skills," and when asked if the plaintiff's age had anything to do with that loss, he responded: "I don't know." (*Id.* at pp. 732–733.) This evidence was ambiguous to show pretext on its own, but was bolstered by the weakness of the company's stated nondiscriminatory reasons for the demotion. (*Id.* at p. 733.) As the Court of Appeal observed, the district court had "cast into doubt" all but two of the approximately 18 incidents that allegedly motivated the demotion: " 'six to ten typographical errors' " and failure to schedule a meeting. (*Ibid.*) Unlike in *Burns,* Webb did not dispute the lion's share of the performance issues that DSM established through competent evidence, including conduct that indicated both dishonesty and inability to meet performance targets.

17

In addition to her arguments on the work performance issues, Webb contends "implausibilities and inconsistencies" surrounding her termination "support a reasonable inference of disability discrimination." She cites to *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, in this regard. Her reliance on *Soria*, however, is misplaced. In that case, the plaintiff alleged she was terminated from her position at a radio station due to disability discrimination. (*Id.* at p. 577.) Univision relied on declarations from her supervisors to support its proffered legitimate reason for termination: plaintiff's tardiness. (*Id.* at pp. 580–581.) One supervisor stated in his declaration that in 2011, he observed the plaintiff arriving late two to three times per week and reported her tardiness each time. (*Id.* at p. 595.) At his deposition, however, the supervisor testified he reported her tardiness only three or four times total. (*Ibid.*) Another supervisor stated in her declaration that she observed the plaintiff arriving late once a month, but in her deposition testified that it was once a week. (*Ibid.*) *Soria* concluded that in light of this *contradictory* testimony—*combined* with her positive performance reviews during this time period, evidence that her purported tardiness had persisted for years, and the proximity between her disability disclosure and termination—the plaintiff had satisfied her burden on pretext. (*Id.* at p. 597.)

Unlike *Soria*, Webb cannot point to any contradictory statements by Marnell or Stackhouse, let alone any other evidence of positive performance reviews or DSM's acceptance of her poor performance over time. Instead, Webb relies on the same speculation and conjecture she urged in connection with the asserted deficiency in DSM's showing on the second step of the *McDonnell Douglas* test, including the absence of written documentation of

18

the May 31 meeting, the e-mail from Stackhouse to Heim, and that Webb had not been warned her job was in jeopardy.

Webb puts particular emphasis on the e-mail exchange between Stackhouse and Heim, which we have previously quoted in its entirety. She maintains Stackhouse's e-mail described Webb's injuries and potential workers' compensation claim "with disbelieving and disparaging language" and asserts it thus supports an inference that DSM harbored "discriminatory animus" towards her. This is neither a reasonable, nor fair, characterization of Stackhouse's e-mail. On the contrary, it is clear Stackhouse was relaying second-hand information that Webb "apparently" needed surgery and was "claiming" her eye injury happened during a work-related accident. Stackhouse was therefore entirely correct in "[t]hinking Worker's comp"; indeed, Webb had told Marnell she had a potential claim. No reasonable inference of discriminatory animus can be drawn from this brief exchange.

Webb also claims a triable issue of pretext exists given the temporal closeness of her disclosure of her retinal injury (May 31) and the cessation of her employment (on or about June 16). However, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353 (*Arteaga*).)

"This is especially so where the employer raised questions about the employee's performance before he disclosed his symptoms, and the subsequent termination was based on those performance issues." (*Arteaga*, *supra*, 163 Cal.App.4th at p. 353, italics omitted.) Here, the uncontroverted evidence presented by DSM showed that not only had serious concerns been raised about Webb's performance before she reported her injury, but the

decision to terminate her employment had already been made, subject to review by the legal department.  Thus, the temporal proximity between Webb's disclosure and the end of her employment is not enough to satisfy her burden on pretext.

In sum, the trial court did not err in granting summary judgment as to Webb's disability discrimination and retaliation claims.

## New Trial Motion

Webb maintains that even if she failed to raise a triable issue under the *McDonnell Douglas* tri-partite analysis, the judgment should nevertheless be reversed because the trial court declined to consider her mixed-motive theory, raised for the first time in her motion for new trial.

### Standard of Review

"We will not disturb the trial court's determination of a motion for a new trial unless the court has abused its discretion."  (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.)  "When the court has denied a motion for a new trial, however, we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion."  (*Ibid.*)

### Mixed Motive Analysis

The *McDonnell Douglas* test is used in cases where an employer presents a single motive for its adverse action.  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214–215 (*Harris*).)  "By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action."  (*Id.* at p. 215.)  In a mixed-motives case, however, the employer does not rely on a "single 'true' reason" for its adverse action.

20

(*Ibid.*)  Instead, the employer raises an *affirmative defense* that if it is found to have both mixed discriminatory and nondiscriminatory motives, the nondiscriminatory reasons alone would have induced it to take the same action.  (*Id.* at p. 240; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 481–482.)

"Ultimately, courts have recognized that whether a court applies the *McDonnell Douglas* framework or the mixed-motive analysis described in *Quigg* [*v. Thomas County School District* (11th Cir. 2016) 814 F.3d 1227], the relevant inquiry devolves to a showing of some discriminatory animus.  (See, e.g., *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1122 [employees may survive a motion for summary judgment through the *McDonnell Douglas* framework or by simply showing a genuine issue of material fact exists as to whether an illegal reason was a motivating factor in an adverse action] . . .].)  [¶] In short, when an employee fails to establish pretext, evidence of discriminatory animus is the sine qua non of a discrimination claim.  Moreover, *Harris* tells us 'there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer' and a plaintiff must demonstrate 'discrimination was a substantial motivating factor, rather than simply a motivating factor.'  (*Harris, supra*, 56 Cal.4th at pp. 215, 232 . . . ; see *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 . . . ['[P]roof of discriminatory animus does not end the analysis of a discrimination claim.  There must also be evidence of a causal relationship between the animus and the adverse employment action.'].)  If triable issues of material fact exist whether discrimination was a substantial motivating reason for the employer's adverse employment action, even if the employer's professed legitimate reason has not been disputed, the FEHA claim is not properly

resolved on summary judgment." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1185–1186, italics omitted (*Husman*).)

Webb relies on *Husman* to support her assertion that the trial court was required to consider her belatedly proffered mixed-motive theory. In *Husman*, neither party discussed *Harris* or a mixed-motive analysis in their summary judgment papers (or in their briefs on appeal), but Toyota had included a mixed-motive defense in its answer. (*Husman*, *supra*, 12 Cal.App.5th at p. 1187.) And while the plaintiff "did not cite *Harris* or identify his claim as relying on mixed-motive analysis, he provided the trial court with all of the elements of a mixed-motive claim." (*Id.* at pp. 1187–1188.) The Court of Appeal recognized its consideration of such theory for the first time on appeal was a matter committed to its discretion and concluded the record before it justified exercising its discretion in favor of review. (*Ibid.*) Here, in contrast, DSM never asserted a mixed-motive affirmative defense.

But even if the trial court should have, during the new trial proceedings, examined the evidence through a mixed-motive lens, any such shortcoming in the court's review was harmless. Under the *McDonnell Douglas* and mixed-motive rubrics, the inquiry at the summary judgment stage is essentially the same—it focuses "on whether the employment decision was substantially motivated by discriminatory animus." (*Husman*, *supra*, 12 Cal.App.5th at p. 1188.)

In *Husman*, the Court of Appeal concluded it was a "close case," but the plaintiff had raised a triable issue that anti-gay bias was a substantial motivating factor in the termination of his employment. (*Husman*, *supra*, 12 Cal.App.5th at p. 1192.) The record contained evidence that the plaintiff's supervisor harbored stereotypical views of gay men, told the plaintiff he had

made " 'a very clear statement' " about his sexual orientation and should cut his hair, and ridiculed him for wearing a certain clothing accessory.  (*Id.* at p. 1191.)  The record also contained evidence that given Toyota's management style, including that multiple individuals had input into employment termination decisions, this individual would likely have had some impact on the decision-making process: "[E]ven if Pelliccioni's remarks were not made in the direct context of the termination decision, given [his] position it is difficult to deny that any bias he felt or expressed toward [the plaintiff] had the capacity to affect management's perceptions of [the plaintiff's] performance and attitude, as well as exacerbate [the plaintiff's] own increasingly alienated behavior.  [Citation.]  This connection was confirmed by Bybee's statements to [the plaintiff] that he was being fired for 'excluding the majority' and that Pelliccioni had it out for him.  As such, Pelliccioni's remarks were sufficiently connected to the ultimate decision to terminate [the plaintiff] and should have been considered by the trial court in evaluating the justification for termination proffered by Bybee."  (*Id.* at p. 1192.)

Here, in contrast, the record contains no evidence that either Marnell or Stackhouse—the decisionmakers—were motivated in any respect, let alone, "substantially motivated" to terminate Webb's employment because of her retinal injury.  (*Husman*, *supra*, 12 Cal.App.5th at p. 1188.)  To the contrary, uncontroverted admissible evidence established that Marnell and Stackhouse did not learn of Webb's injury and temporary driving and travel restrictions until after they had decided to move forward with terminating her employment for poor performance.

## DISPOSITION

The judgment is affirmed.  Costs on appeal to respondents.

23

_____
Banke, J.

We concur:


_____
Margulies, P.J.


_____
East, J.*


*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A161544, *Webb v. DSM Engineering Plastics, Inc.*